# SHEET METAL WORKERS' INTERNATIONAL ASSN. ET AL. *v.* LYNN

No. 86–1940.   Argued November 7, 1988—Decided January 18, 1989

*Donald W. Fisher* argued the cause for petitioners. With him on the briefs were *Julius Reich, David M. Silberman,* and *Laurence Gold.*

*Bruce Stark* argued the cause for respondent. With him on the brief were *Paul Alan Levy, Arthur L. Fox II,* and *Alan B. Morrison.*

JUSTICE MARSHALL delivered the opinion of the Court.

In *Finnegan* v. *Leu,* 456 U. S. 431 (1982), we held that the discharge of a union's appointed business agents by the union president, following his election over the incumbent for

whom the business agents had campaigned, did not violate the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA or Act), 73 Stat. 519, 29 U. S. C. § 401 *et seq.* The question presented in this case is whether the removal of an elected business agent, in retaliation for statements he made at a union meeting in opposition to a dues increase sought by the union trustee, violated the LMRDA. The Court of Appeals for the Ninth Circuit held that the LMRDA protected the business agent from removal under these circumstances. We granted certiorari to address this important issue concerning the internal governance of labor unions, 485 U. S. 958 (1988), and now affirm.

I

In June 1981, respondent Edward Lynn was elected to a 3-year term as a business representative of petitioner Local 75 of the Sheet Metal Workers' International Association (Local), an affiliate of petitioner Sheet Metal Workers' International Association (International).[1] Lynn was instrumental in organizing fellow members of the Local who were concerned about a financial crisis plaguing the Local. These members, who called themselves the Sheet Metal Club Local 75 (Club), published leaflets that demonstrated, on the basis of Department of Labor statistics, that the Local's officials were spending far more than the officials of two other sheet metal locals in the area. The Club urged the Local's officials to reduce expenditures rather than increase dues in order to alleviate the Local's financial problems. A majority of the Local's members apparently agreed, for they defeated three successive proposals to increase dues.

Following the third vote, in June 1982, the Local's 17 officials, including Lynn, sent a letter to the International's general president, requesting that he "immediately take what-

---

[1] The Local was dissolved in March 1985. Two other sheet metal locals, not parties below or before this Court, presently have joint responsibility for the Local's legal obligations.

ever action [is] . . . necessary including, but not limited to, trusteeship to put this local on a sound financial basis." App. 14. Invoking his authority under the International's constitution, the general president responded by placing the Local under a trusteeship and by delegating to the trustee, Richard Hawkins, the authority "to supervise and direct" the affairs of the Local, "including, but not limited to, the authority to suspend local union . . . officers, business managers, or business representatives." Art. 3, § 2(c), Constitution and Ritual of the Sheet Metal Workers' International Association, Revised and Amended by Authority of the Thirty-Fifth General Convention, St. Louis, Missouri (1978).

Within a month of his appointment, Hawkins decided that a dues increase was needed to rectify the Local's financial situation. Recognizing that he lacked authority to impose a dues increase unilaterally, Hawkins prepared a proposal to that effect which he submitted to and which was approved by the Local's executive board. A special meeting was then convened to put the dues proposal to a membership vote. Prior to the meeting, Hawkins advised Lynn that he expected Lynn's support. Lynn responded that he first wanted a commitment to reduce expenditures, which Hawkins declined to provide. Lynn thus spoke in opposition to the dues proposal at the special meeting. The proposal was defeated by the members in a secret ballot vote. Five days later, Hawkins notified Lynn that he was being removed "indefinitely" from his position as business representative specifically because of his outspoken opposition to the dues increase. App. 20.

After exhausting his intraunion remedies, Lynn brought suit in District Court under § 102 of the LMRDA, 29 U. S. C. § 412, claiming, *inter alia*, that his removal from office violated § 101(a)(2), the free speech provision of Title I of the LMRDA, 29 U. S. C. § 411(a)(2).[2] The District Court

---

[2] Section 101(a)(2) of the LMRDA, titled "Freedom of Speech and Assembly," provides:

granted summary judgment for petitioners, reasoning that, under *Finnegan* v. *Leu, supra*, "[a] union member's statutory right to oppose union policies affords him no protection against dismissal from employment as an agent of the union because of such opposition." App. to Pet. for Cert. 36a.

The Court of Appeals for the Ninth Circuit reversed. 804 F. 2d 1472 (1986). The court held that *Finnegan* did not control where the dismissed union employee was an elected, rather than an appointed, official because removal of the former "can only impede the democratic governance of the union." 804 F. 2d, at 1479. "Allowing the removal of an elected official for exercising his free speech rights," the court explained, "would in effect nullify a member's right to vote for a candidate whose views he supports," *id.*, at 1479, n. 7, and would impinge on the official's right to "spea[k] . . . for himself as a member" of the union. *Id.*, at 1479. The court also rejected the contention that Lynn's removal was valid because it was carried out under the trusteeship, stating that, "while a trustee may remove an elected local officer for financial misconduct, or incompetence, it may not do so in retaliation for the exercise of a right protected by the

---

"Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 73 Stat. 522.

Section 102 provides in relevant part:

"Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." *Id.*, at 523.

LMRDA, such as free speech." *Id.*, at 1480 (citations omitted).[3]

## II

The LMRDA "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan*, 456 U. S., at 435. The major reform bills originally introduced in the Senate, as well as the bill ultimately reported out of the Committee on Labor and Public Welfare, S. 1555, 86th Cong., 1st Sess. (1959), dealt primarily with disclosure requirements, elections, and trusteeships. The legislation that evolved into Title I of the LMRDA, the "Bill of Rights of Members of Labor Organizations," was adopted as an amendment on the Senate floor by "legislators [who] feared that the bill did not go far enough because it did not provide general protection to union members who spoke out against the union leadership." *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 109 (1982).[4] "[D]esigned to guarantee every member equal voting rights, rights of free speech and assembly, and a right to sue," *ibid.*, the amendment was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Finnegan*, 456 U. S., at 435. In providing such protection, Congress sought to further the basic objective of the LMRDA: "ensuring that unions [are] democratically governed and responsive to the will of their memberships." *Id.*, at 436; see also *Reed* v. *Transportation Union, ante,* at 325; *Sadlowski, supra,* at 112.

We considered this basic objective in *Finnegan*, where several members of a local union who held staff positions as

---

[3] The dissent argued that "the mere fact that Lynn was an elected officer is not sufficient" to distinguish *Finnegan* from the instant case, 804 F. 2d, at 1486, because "the injury suffered by Lynn is primarily connected with his status as an officer, not a union member." *Id.*, at 1487.

[4] Title I "was quickly accepted without substantive change by the House." *Furniture Moving Drivers* v. *Crowley*, 467 U. S. 526, 538 (1984); see also *Finnegan* v. *Leu*, 456 U. S. 431, 435, n. 4 (1982).

business agents were discharged by the local's newly elected president. The business agents had been appointed by the incumbent president and had openly supported him in his unsuccessful reelection campaign. They subsequently sought relief under § 102 of the LMRDA, claiming that discharge from their appointed positions constituted an "infringement" of their free speech and equal voting rights as guaranteed by Title I.

We held that the business agents could not establish a violation of § 102 because their claims were inconsistent with the LMRDA's "overriding objective" of democratic union governance. 456 U. S., at 441. Permitting a victorious candidate to appoint his own staff did not frustrate that objective; rather, it ensured a union's "responsiveness to the mandate of the union election." *Ibid.* We thus concluded that the LMRDA did not "restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Ibid.* In rejecting the business agents' claim, we did not consider whether the retaliatory removal of an elected official violates the LMRDA and, if so, whether it is significant that the removal is carried out under a validly imposed trusteeship. It is to these questions that we now turn.[5]

## A

Petitioners argue that Lynn's Title I rights were not "infringed" for purposes of § 102 because Lynn, like other

---

[5] The business agents in *Finnegan* also claimed that their discharge violated § 609 of the LMRDA, 29 U. S. C. § 529, which makes it unlawful for a union or its officials "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act." 73 Stat. 541. We rejected this claim, holding that "removal from appointive union employment is not within the scope of those union sanctions explicitly prohibited by § 609." 456 U. S., at 439.

Lynn's complaint makes reference to § 609, App. 8, but the Court of Appeals' analysis of his Title I claim is limited to a discussion of § 102. Lynn's § 609 claim is not before the Court, nor are the other claims rejected by the lower courts.

members of the Local, was not prevented from attending the special meeting, expressing his views on Hawkins' dues proposal, or casting his vote, and because he remains a member of the Local. Under this view, Lynn's status as an elected, rather than an appointed, official is essentially immaterial and the loss of union employment cannot amount to a Title I violation.

This argument is unpersuasive. In the first place, we acknowledged in *Finnegan* that the business agents' Title I rights had been interfered with, albeit indirectly, because the agents had been forced to choose between their rights and their jobs. See *id.*, at 440, 442. This was so even though the business agents were not actually prevented from exercising their Title I rights. The same is true here. Lynn was able to attend the special meeting, to express views in opposition to Hawkins' dues proposal, and to cast his vote. In taking these actions, Lynn "was exercising . . . membership right[s] protected by section 101(a)." 804 F. 2d, at 1479. Given that Lynn was removed from his post as a direct result of his decision to express disagreement with Hawkins' dues proposal at the special meeting, and that his removal presumably discouraged him from speaking out in the future, Lynn paid a price for the exercise of his membership rights.

This is not, of course, the end of the analysis. Whether such interference with Title I rights gives rise to a cause of action under § 102 must be judged by reference to the LMRDA's basic objective: "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Finnegan*, 456 U. S., at 441. In *Finnegan*, this goal was furthered when the newly elected union president discharged the appointed staff of the ousted incumbent. Indeed, the basis for the *Finnegan* holding was the recognition that the newly elected president's victory might be rendered meaningless if a disloyal staff were able to thwart the implemen-

tation of his programs. While such patronage-related discharges had some chilling effect on the free speech rights of the business agents, we found this concern outweighed by the need to vindicate the democratic choice made by the union electorate.

The consequences of the removal of an elected official are much different. To begin with, when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice. Indeed, Lynn's removal deprived the membership of his leadership, knowledge, and advice at a critical time for the Local. His removal, therefore, hardly was "an integral part of ensuring a union administration's responsiveness to the mandate of the union election." *Ibid.;* see also *Wirtz* v. *Hotel Employees*, 391 U. S. 492, 497 (1968).

Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him. See *Hall* v. *Cole*, 412 U. S. 1, 8 (1973). Seeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal,[6] other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what Congress sought to prevent when it passed the LMRDA. "It recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sadlowski*, 457 U. S., at 112. We thus hold that Lynn's retaliatory removal stated a cause of action under § 102.[7]

---

[6] There is no suggestion that Lynn's speech in opposition to the dues increase contravened any obligation properly imposed upon him as an elected business agent of the Local.

[7] In reaching this conclusion, we reject petitioners' contention that a union official must establish that his firing was part of a systematic effort

## B

Petitioners next contend that, even if the removal of an elected official for the exercise of his Title I rights ordinarily states a cause of action under § 102, a different result obtains here because Lynn was removed during a trusteeship lawfully imposed under Title III of the LMRDA, 73 Stat. 530–532, 29 U. S. C. §§ 461–466.

We disagree. In the first place, we find nothing in the language of the LMRDA or its legislative history to suggest that Congress intended Title I rights to fall by the wayside whenever a trusteeship is imposed. Had Congress contemplated such a result, we would expect to find some discussion of it in the text of the LMRDA or its legislative history.[8] Given

---

to stifle dissent within the union in order to state a claim under § 102. Although in *Finnegan* we noted that a § 102 claim might arise if a union official were dismissed "as 'part of a purposeful and deliberate attempt . . . to suppress dissent within the union,'" 456 U. S., at 441, quoting *Schonfeld* v. *Penza*, 477 F. 2d 899, 904 (CA2 1973), we did not find that this constituted the *only* situation giving rise to a § 102 claim. We merely stated that we did not have such a case before us, and that we expressed no view as to its proper resolution. 456 U. S., at 441. Likewise, we explicitly reserved the question "whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees." *Id.*, at 441, n. 11.

[8] The LMRDA's trusteeship provisions first appeared as Title II of the Kennedy-Ives bill passed by the Senate in June 1958. S. 3974, 85th Cong., 2d Sess. Title II was a response to the findings of the Senate Select Committee on Improper Activities in the Labor or Management Field, popularly known as the McClellan Committee, which "exposed the details of the sad state of democracy in large sections of the labor movement and provided numerous examples of abuses of the trusteeship power." Note, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L. J. 1460, 1473 (1962). The McClellan Committee found, in particular, that trusteeships were too often "baselessly imposed." S. Rep. No. 1417, 85th Cong., 2d Sess., 4 (1958).

Title II reappeared in the Kennedy-Ervin bill reported out of the Committee on Labor and Public Welfare in the next Congress. S. 1555, 86th Cong., 1st Sess. (1959). The Committee Report accompanying this bill, although recognizing that trusteeships were sometimes necessary, stressed that "labor history and the hearings of the McClellan committee

Congress' silence on this point, a trustee's authority under Title III ordinarily should be construed in a manner consistent with the protections provided in Title I. See *McDonald v. Oliver*, 525 F. 2d 1217, 1229 (CA5), cert. denied, 429 U. S. 817 (1976); *United Brotherhood of Carpenters & Joiners* v. *Brown*, 343 F. 2d 872, 882–883 (CA10 1965); *United Brotherhood of Carpenters & Joiners* v. *Dale*, 118 LRRM 3160, 3167 (CD Cal. 1985).

Whether there are any circumstances under which a trustee acting pursuant to Title III can override Title I free speech rights is a question we need not confront.[9] Section 101(a)(3) of Title I, 29 U. S. C. § 411(a)(3), guarantees to the members of a local union the right to vote on any dues in-

demonstrate that in some instances trusteeships have been used as a means of consolidating the power of corrupt union officers, plundering and dissipating the resources of local unions, *and preventing the growth of competing political elements within the organization.*" S. Rep. No. 187, 86th Cong., 1st Sess., 17 (1959) (emphasis added); see also H. R. Rep. No. 741, 86th Cong., 1st Sess., 13 (1959).

After the addition of Title I on the Senate floor, there was little discussion in either House of the relationship between Title I and the trusteeship provisions now contained in Title III. This is not surprising. From the time the trusteeship provisions were first proposed in the spring of 1958, congressional attention was directed toward the LMRDA's more controversial titles, "while the trusteeship title glided quietly though the labyrinthine process from bill to bill with little change and less discussion." Note, 71 Yale L. J., *supra*, at 1475. One exception is the debate over an amendment proposed by Senator Dodd to require the approval of the Secretary of Labor before a trusteeship could be imposed. 105 Cong. Rec. 6675–6681 (1959). In successfully opposing this amendment, Senator Morse emphasized the importance of "look[ing] at the trustee section of the bill . . . *in the light of the other sections of the bill*, and not[ing] what the committee has done by way of setting up democratic procedures to protect the rank and file of the local unions." *Id.*, at 6678 (emphasis added).

[9] As Lynn notes, "the precise scope of a trustee's power pursuant to Title III, and the nature of the democratic rights of the members that survive a trusteeship, are matters that have engendered little litigation in the lower courts." Brief for Respondent 31. We thus proceed with caution in this relatively uncharted territory.

crease,[10] and, as petitioners conceded at oral argument, this critical Title I right does not vanish with the imposition of a trusteeship.   Tr. of Oral. Arg. 5.   A trustee seeking to restore the financial stability of a local union through a dues increase thus is required to seek the approval of the union's members.   In order to ensure that the union members' democratic right to decide on a dues proposal is meaningful, the right to exchange views on the advantages and disadvantages of such a measure must be protected.   A trustee should not be able to control the debate over an issue which, by statute, is beyond his control.

In the instant case, Lynn's statements concerning the proposed dues increase were entitled to protection.   Petitioners point to nothing in the International's constitution to suggest that the nature of Lynn's office changed once the trusteeship was imposed, so that Lynn was obligated to support Hawkins' positions.   Thus, at the special meeting, Lynn was free to express the view apparently shared by a majority of the Local's members that the best solution to the Local's financial problems was not an increase in dues, but a reduction in expenditures.   Under these circumstances, Hawkins violated Lynn's Title I rights when he removed Lynn from his post.[11]

---

[10] Section 101(a)(3) of the LMRDA provides in part:

"[T]he rates of dues and initiation fees payable by members of any labor organization in effect on the date of enactment of this Act shall not be increased, and no general or special assessment shall be levied upon such members, except—

"(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot . . . ."   73 Stat. 522.

[11] Lynn's posttrusteeship status thus was much the same as it was before the trusteeship.   We do not address a situation where an international's constitution provides that, when a trusteeship is imposed, elected officials are required to support the trustee's policies and thus may occupy a status

## III

For the reasons stated herein, we conclude that Lynn's removal from his position as business representative constituted a violation of Title I of the LMRDA. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, concurring in the judgment.

*Finnegan* v. *Leu,* 456 U. S. 431, 436–437 (1982), observed that "[i]t is readily apparent, both from the language of these provisions and from the legislative history of Title I, that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect" (footnote omitted). If that is so and if a case involves speech in the capacity of an officer, it should make no difference that the officer is elected rather than appointed. But in *Finnegan,* it was asserted that the officer was removed because of his campaign activities, as a member, in a union election, which was speech protected by Title I. In response, the Court said that under the union constitution the newly elected president had power to appoint and remove officers and that he was entitled to start out with officers in whom he had confidence. This was sufficient to dispose of the officers' claim under Title I.

In the case before us, the speech for which respondent was removed was also speech in the capacity of a member. The duties of a union business agent are defined in the union constitution. Those duties relate primarily to collective bargaining and administering the collective-bargaining contract. They do not seem to include supporting the union president's proposal to increase union dues; and if they did, I am not so

similar to the appointed officials in *Finnegan.* Cf. § 101(b), Title I, 73 Stat. 523, 29 U. S. C. § 411(b).

sure that respondent would have spoken out against the dues increase at all.

In this case, unlike *Finnegan*, respondent was not discharged by an incoming elected president with power to appoint his own staff, but by a trustee whose power to dismiss and appoint officers, for all that is shown here, went no further than the Local's president to discharge for cause, *i. e.*, for incompetence or other behavior disqualifying them for the tasks they were expected to perform as officers.  Respondent's speech opposing the dues increase was the speech of a member about a matter the members were to resolve, and there is no countervailing interest rooted in union democracy that suffices to override that protection.

Thus, I doubt that resolution of cases like this turns on whether an officer is elected or appointed.  Rather its inquiry is whether an officer speaks as a member or as an officer in discharge of his assigned duties.  If the former, he is protected by Title I.  If the latter, the issue becomes whether other considerations deprive the officer/member of the protections of that Title.