**Dennis MERRIMAN, Plaintiff,**

v.

**Mike LaHOOD, Don Carter, Tom Larimore, Duane Demmin, Dan Maras, and Mike Hasty, Defendants.**

**No. 89–1193.**

United States District Court, C.D. Illinois.

June 6, 1990.

David W. Stuckel, Peoria, Ill., for plaintiff.

Ronald L. Hamm, Peoria, Ill., for defendants.

## ORDER

MIHM, District Judge.

In this cause of action the Plaintiff has sued officials of his labor union for discharging him from his union job, allegedly in retaliation for Plaintiff's support of an opposing slate of candidates in a union election. Pending before the Court is the Defendants' Motion for Summary Judgment, which has been fully briefed and argued. For the reasons stated below, that Motion is granted.

## FACTS

The Laborers' International Union of North America is composed of members of various Local unions. The International Constitution provides that the Locals are "subject to the laws, rules, regulations, policies, practices and lawful orders and decisions of the International Union." (International Constitution, Art. I § 1). The International decides "all questions relating to the rights, privileges and obligations of members and subordinate bodies" (Art. II § 2(c)) and may "establish, declare, decide and enforce all matters of policy ... and orders or decisions." (Art. II § 2(d)).

The various Local unions are governed by the Uniform Local Union Constitution, which provides among other things that the Locals will "comply with all ... policies ... and lawful orders and decisions of the International Union." (Local Constitution, Art. II § 3(b)).

The power to interpret the International Constitution, as well as the Local Constitution (discussed below) is vested solely in the General President of the International (International Constitution, Art. IX § 4) and such decisions are binding unless the General Executive Board of the International reverses or modifies a decision. *Id.*

The Local Constitution provides that the Local's Executive Board is to govern the business affairs of the Local. (Art. IV § 4(H)(9)). The Executive Board consists of several elected officers including the Business Manager. Among the constitutionally-mandated duties of the Business Manager is direct supervision of the local union field representatives who are appointed by the Executive Board "after recommendations from the Business Manager." Local Constitution, Art. IV § (4)(H)(10). The Executive Board also determines the salary of the field representative. *Id.* Once appointed, a field representative is answerable to the Business Manager. Art. IV § 4(E)(4).

At all relevant times, the Local's Business Manager was Melvin C. Hasty, who recommended to the Board that the Plaintiff be employed by Local 165 as a field representative to replace a field representative who was to retire on August 1, 1989. On May 26, 1989, the Executive Board approved the appointment of Merriman 5 to 1. The dissenting vote was cast by Milton J. Hasty, the Secretary/Treasurer of the Board.

During the same month, the Local conducted a campaign and election for positions on the Board. During the campaign, Plaintiff had supported a slate of candidates which was defeated in the election on May 20. The successful candidates included the Defendants in this case. The new members of the Board assumed their offices on June 5, 1989.

The complaint alleges that, at various times during the campaign and after the election, one or more of the individual Defendants stated that if they won the election they would remove Plaintiff from his position as field representative. True to their word, they relieved Plaintiff of his union duties on July 5, 1989. Plaintiff's discharge was presented to the membership on August 1, 1989 and was approved.

Between May and July, a series of communications went back and forth between officers of the International and various officials of the Local. These letters are summarized below:

May 30, 1989—Milton J. Hasty, the Local's Secretary/Treasurer, wrote to Wilbur Freitag, Vice President of the International, stating his opinion that the Executive Board did not have the power to

appoint Merriman since the Board members would be out of office as of June 5, 1989. He requested that the International "come into Local # 165 and make a decision."

June 13, 1989—Angelo Fosco, General President of the International, wrote to Freitag (apparently in response to Freitag's forwarding of the May 30 letter) stating that "an outgoing Executive Board cannot remove decision-making authority from an incoming Board by acting to appoint one or more Field Representatives ... during the limited time they remain in office following an election in which [they] have been substantially defeated." Such conduct was described by Fosco as "contrary to fundamental democratic principles." He concluded that such appointments "cannot be allowed to stand."

June 22, 1989—Freitag wrote to the Local, relying on Fosco's letter, that "[a]ny attempt by defeated incumbents to continue the effects of their decision-making by midnight appointments is contrary to fundamental democratic principles and cannot be allowed to stand."

June 29, 1989—Melvin C. Hasty telegrammed Fosco questioning Freitag's position as expressed in the June 22 letter.

July 5, 1989—Fosco replied briefly to the telegram, stating that Freitag's position was "the only one which is consistent with democratic principles."

July 18, 1989—Fosco expanded upon his July 5 letter by writing to Melvin Hasty that selection and appointment of field representatives was a matter "of finding the proper constitutional balance of authority and responsibility." In this letter, Fosco made several qualifications to the rather broad conclusions previously stated. In particular:

—"the Business Manager recommends specific individual(s) to be hired and the Executive Board, after giving due regard to his recommendation, appoints the representative(s).

—"the appointment and discharge of field representatives is lodged in the joint authority of the Business Manager and the Executive Board," who must "work together effectively and achieve the necessary compromise in order to implement the wishes of the membership."

—"the duty of compromise falls upon the Local Union Executive Board. The Executive Board cannot unilaterally hire or fire representatives but must solicit from the Business Manager his recommendation and give it due regard."

—"it would be impossible for the Business Manager to perform his duties properly if he were saddled with field representatives who could or would not perform their assignments. The Board must therefore give primary weight to the recommendations of the Business Manager on questions of hiring or firing."

July 18, 1989—A second letter from Fosco was sent to the Local in which he explained that Merriman could not utilize the grievance procedures set out in the Local Constitution to resolve the dispute regarding his discharge.

In this suit, Plaintiff claims that his discharge was in retaliation for his support of the opposing slate of candidates, an action which allegedly violates the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411 *et seq.* Plaintiff seeks monetary damages equivalent to the salary he would have earned in his union position, reinstatement to his position, injunctive relief and punitive damages, as well as costs, expenses and attorney's fees.

In their Motion for Summary Judgment, Defendants argue first that, at the time of Plaintiff's appointment, the position to which he was appointed was not vacant and that the subsequent termination was therefore not improper under the LMRDA. Second, Defendants argue that their motive was not improper as they were relying on the advice ·of the International. Defendants rely upon two Supreme Court cases, *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), and *Sheetmetal Workers v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989).

The Plaintiff argues that a genuine issue of material fact exists with regard to the Defendants' motivation for terminating Plaintiff's position as field representative. In addition, Plaintiff distinguishes both *Finnegan* and *Lynn* as factually dissimilar and thus not controlling.

## DISCUSSION

The Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*, was enacted to protect the rights of union members to participate in the government of their union. Section 401.

Section 411 enunciates specific rights which members of labor organizations have within their respective organizations. It provides in pertinent part:

(a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Section 412 provides that:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. . . .

Section 529 provides:

Prohibition on certain discipline by labor organization

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.

The LMRDA resulted from congressional concern regarding the impact on union members of abuses of power by union leadership. The Act includes disclosure requirements, regulation of union trusteeships and elections, as well as protection for union members paralleling various rights guaranteed by the federal Constitution. Congress considered such protection necessary "to further the Act's primary objective of insuring that unions would be democratically governed and responsive to the will of their memberships." *Finnegan v. Leu,* 456 U.S. 431, 435–36, 102 S.Ct. 1867, 1870.

In *Finnegan,* a newly elected union local president discharged the union's business agents who had supported a different candidate. The discharged agents claimed that this action violated both § 529 of the LMRDA (since it disciplined them for exercising a protected right) and § 412 (since it violated their free speech rights under § 411).

The Supreme Court held first that the LMRDA specifically protects enumerated rights to members of a labor organization (§ 411) and makes it unlawful for a union to discipline any of its members for exercising those rights (§ 529). The Supreme Court concluded that the term "discipline" as used in § 529 refers only to retaliatory actions "that affect a union member's

rights or status as a member of the union." Discharge from union employment, since it does not impinge upon incidents of union membership, does not fall within the meaning of "discipline." *Id.* at 437–38, 102 S.Ct. at 1871. *Accord, Breininger v. Sheet Metal Workers,* —— U.S. ——, 110 S.Ct. 424, 438, 107 L.Ed.2d 388 (1989).

The Supreme Court went on to consider § 412, which creates an individual right of action for persons whose § 411 rights have been violated. The Supreme Court held that, whatever other limitations § 411 might place on a union's authority to dismiss its employees for political reasons, it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. 456 U.S. at 441, 102 S.Ct. at 1873. The Supreme Court expressly left open the question whether that "unrestricted" freedom might be restricted in a situation in which the discharged employee was a non-policy making and non-confidential employee. *Id.* at n. 11. This distinction between policy-making employees and other rank and file employees was reiterated by the concurrence which joined in the result only with that particular limitation. *Id.,* 456 U.S. at 442–43, 102 S.Ct. at 1873–74.

The *Finnegan* Court's approach to § 411 was one of balancing the impact of the challenged union action on the union's democratic processes against the potential for chill of free speech rights. In determining the relative degrees of impact, the *Finnegan* Court noted that the discharged employees had not actually been prevented from exercising rights guaranteed under § 411; rather, they had been forced to choose between exercising their rights and continuing their union employment. The Court intimated that this had some bearing on the weight to be accorded the relative impacts.

That issue was more extensively addressed in *Sheet Metal Workers v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989). In *Lynn,* the Supreme Court considered the discharge of a local *elected* business agent in retaliation for a policy dispute with one of the union trustees.

The Supreme Court clearly distinguished between elected and appointed officials, holding that although the elected official was not actually prevented from exercising the rights protected by the statute, his removal interfered with those rights by forcing him to choose between them and the job.

The Supreme Court emphasized that removal of an elected official denies the members who voted for him the representative of their choice and thus has a far more pronounced chilling effect upon exercise of protected rights than does removal of an appointed official. In that analysis, the Court stated that finding interference with protected rights by union actions is not the end of the analysis. Rather, the interference itself must be judged by reference to the LMRDA's basic objective, "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Id.,* 109 S.Ct. at 644, citing from *Finnegan,* 456 U.S. at 441, 102 S.Ct. at 1873.

The *Lynn* Court interpreted *Finnegan* as furthering this democratic goal by permitting a victorious candidate to appoint his own staff, ensuring the union's responsiveness to the mandate of the union's election. In other words, a validly elected president's victory might be meaningless if a disloyal staff were able to thwart implementation of his programs. The Court acknowledged that while this patronage system might have some chilling effect on the free speech rights of appointed officers, the chilling effect was outweighed by the need to vindicate the democratic choice made by the union electorate. *Id.,* 109 S.Ct. at 644.

The Supreme Court then compared that situation with the removal of an elected official, noting the devastating impact on the democratic processes. Removal of an elected official would deprive the membership of the leadership they wanted and could therefore not be said to be consistent with the goals of the statute. The Court also noted the relatively higher degree of chilling involved when elected officials are

discharged, since not only free speech rights of the elected official but also the corresponding rights of the members who voted for him are diminished.

In both *Finnegan* and *Lynn*, the Supreme Court looked at a number of factors which it considered important in balancing the democratic processes of the union with the free speech rights of its members. First, the nature of the job of the discharged person is vital: whether or not the discharged person was a policy-making employee; whether he was elected or appointed; and, if appointed, by whom. In this case, there is no dispute that Merriman was not a policy-making employee, and it is clear that he was appointed by the Executive Board.

Also important are the powers conferred by the union constitution and by-laws on the relevant actors. In the case before the Court, the power to appoint field representatives is vested in the Executive Board, which is limited by recommendations from the Business Manager. The by-laws and constitution say nothing about the person or body in whom the power of discharge is vested, although Fosco's letters indicate that the powers of appointment and discharge are co-extensive. The power of supervision over the field representative is vested in the Business Manager, who is accountable to the local membership. This is very different from the powers which the union president had in *Finnegan* where the constitution provided that the president had the power to appoint, direct, and discharge the business agents.

However, there is more than the constitution itself involved in this case. As noted by the Defendants, the constitution requires that the Executive Board report its activities to the local membership, which must approve those activities by vote. The record in this case reflects that the discharge of the Plaintiff was reported as required and that the membership approved that action. The record does not reflect whether the hiring of Merriman was ever submitted to the membership for approval. If it was, however, any approval would have been overridden by the membership's subsequent approval of his discharge. Thus, despite the fact that the constitution does not confer unilateral power of discharge on the Executive Board, it does provide a method by which actions can be taken when compromise is not forthcoming. That method was followed by the Defendants in this case.

Finally, the ramifications of the union's actions must be weighed into the balance. In this case, the analysis is somewhat complicated since there are two separate union actions which must be analyzed: the appointment of Merriman by one Board and the discharge by another. Both are important because both affect the balance.

It is clear to the Court that the outgoing Board's appointment of Merriman was in direct conflict with the LMRDA's goal of promoting democratic processes in union governance. The interpretation by the International President confirms the conclusion that Merriman's midnight appointment negatively affects the democratic functioning of the Local. That interpretation is binding on the Local. The only member of the outgoing Board who was re-elected was the Business Manager. By appointing the person he recommended, the outgoing Board made it possible for the Business Manager, a clear minority on the new Board, to stymie the majority's will if and when differences in policy existed. That is certainly a substantial incursion into traditional notions of democratic governance. Despite the close constitutional relationship between the Business Manager and the field representative, that relationship cannot justify the undemocratic conduct of the outgoing Board.

Furthermore, the new Board's discharge of Merriman only minimally impacted democratic processes. The new Board acted in conformity with advice from the International President and sought (and received) subsequent approval from the Local membership. To the extent that cooperation between the Board as a whole and its individual members might be a desirable element of union governance, when it is not forthcoming, something has to give. In this case, the new Board took action designed to put into effect the wishes of the majority of the Local's membership.

The Plaintiff argues, however, that the Board was obligated to act in conformity with the Business Manager's recommendation and that their failure to do so demonstrates disregard for democratic principles. The Court disagrees. The Local constitution itself merely states that the appointment is to be "upon recommendations from the business manager." When the Business Manager makes a recommendation, the Board is under no constitutionally mandated obligation to rubber-stamp that recommendation. In particular, in this instance, where the Business Manager was in the minority on the new Board, democratic processes would have required some sort of negotiated compromise between the two factions. There was no obligation on the part of the Business Manager to recommend a person whom the Board wanted and likewise there was no obligation on the part of the Board to approve whoever the Business Manager wanted.

Furthermore, any chill on future exercise of § 411 will be minimal. Union members who are not union employees will not feel chilled at all; Merriman's discharge did not affect his status as a union member. Long-term ministerial union employees will unlikely be discouraged given the unique facts leading up to Merriman's discharge; he was in a category of one. The only serious potential chill might be felt by union members who hope to become union employees, and even there the chill is minimal; while support for a loser may mean no union job, support for a winner may be the only way to obtain such a job.

The Court concludes that the new Board's conduct in discharging Merriman did not violate Merriman's § 411 rights. As a result, he cannot pursue a § 412 cause of action. Accordingly, the Defendants' Motion for Summary Judgment is GRANTED. The Clerk of the Court is directed to enter final judgment in a civil case in favor of the Defendants and against the Plaintiff.