# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-2438

DANIEL VOUGHT and DANIEL ALEXANDER,

*Plaintiffs-Appellants,*

*v.*

THE STATE OF WISCONSIN TEAMSTERS JOINT COUNCIL NO. 39,
FRED GEGARE, PAUL LOVINUS ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 552—**Aaron E. Goodstein**, Magistrate Judge.

ARGUED DECEMBER 11, 2008—DECIDED MARCH 10, 2009

Before MANION, EVANS, and TINDER, *Circuit Judges*.

EVANS, *Circuit Judge.*   If there's any truth to the rumor that Jimmy Hoffa has been resting for the last 33+ years somewhere beneath the end zone at Giants Stadium (or "The Meadowlands" as the New York Jets prefer) in East Rutherford, New Jersey, this case, involving political in-fighting at a Teamster's Local in Wisconsin, might cause his body to stir just a bit.

In today's case, we revisit the question of whether the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 *et seq.*, allows an individual to sue over the loss of appointed union employment. Relying on our precedent, the district court (Magistrate Judge Aaron E. Goodstein sitting with consent) held that it does not. But Daniel Vought and Daniel Alexander, former employees of Local 662 of the International Brotherhood of Teamsters, suggest that rule is wrong. We start with the facts viewed in the light most favorable to their claim.

In 2003, Vought and Alexander worked as appointed business agents for Local 662 in Eau Claire, Wisconsin. At the time, James Newell was the Secretary-Treasurer, the union official with the most authority in the Local. But in a matter of months, all three would be on the outside looking in, removed by new leadership that viewed them with suspicion and distrust.

The power shift began in June 2003 with a disagreement over the proper description for a union health plan. The Clark County Sheriff's Department, then affiliated with the Teamsters, was considering jumping ship and choosing the Wisconsin Professional Police Association as its union representative. Robert Russell was the business agent assigned to the sheriff's department, so it fell upon him to dissuade the department from leaving the Teamsters. Allegedly he was overzealous in this task. According to Newell, Russell misrepresented the nature of a union health plan, claiming that it was only available to Teamsters members when that wasn't the case. When Newell caught wind of this, he told Russell to stop, but Russell disagreed

that he had done anything wrong and disobeyed the order. On June 27, 2003, Newell, with Vought as a witness, confronted Russell once more and ultimately fired him.

Russell sought review by the Local 662 Executive Board, however, and the termination was reversed—despite Newell and Vought's presence on the panel. In addition to Newell and Vought, the board members who heard the case were President Dave Reardon, Vice President Rick Skutak, Trustees John Kaiser and Vicki Kramer, and Tim Wentz. To call the board polarized would be an understatement, and the issue with Russell was just the starting point.

As it turns out, Newell—with the support of Vought and later Alexander—was on something of a crusade. On July 10, 2003, the same day as the reinstatement hearing, Newell and Vought filed charges of impropriety against Reardon, Skutak, and Kaiser. They also charged Russell for the Clark County affair, and Russell shot back with his own charges against Newell, claiming that Newell had a vendetta against Reardon and tried to compel him (Russell) to say Reardon was the man behind the Clark County incident on pain of losing his job. Because all these charges involved Local 662 officers, the whole mess was submitted to Joint Council 39, and a hearing was scheduled for August 1.

Alexander became involved some two days before the hearing. Fellow business agent Steve Novacek approached Alexander that day bearing a message from Reardon. Alexander was a known ally of Newell and Vought, so Reardon's message was simple: As long as he "kept [his] nose out of the . . . hearing, [he] would be okay." But Alexander ignored this warning and testified on behalf of

Newell, supporting his charges against Russell and Reardon. And Vought stood by Newell as well, serving as his hearing representative. At the end of the day, though, the only thing that would come from this aid would be further ostracization; Newell had swiftly become unpopular, and those who had his back were guilty by association.

The Joint Council issued its decision on August 14, 2003, dismissing the charges filed by Newell and Vought and sustaining Russell's charge against Newell. Newell was removed as the Secretary-Treasurer and suspended from membership or employment with the Teamsters for five years. As a result, Reardon became the acting Secretary-Treasurer until the Local 662 Executive Board could meet and decide upon a permanent replacement. Reardon didn't take long to exercise his new-found power. The same day he was tapped for the job, he fired Vought as a business agent. Alexander would be next.

Unlike Vought, however, Alexander was given a chance to save himself. On September 5, 2003, Russell filed a charge against Vought, claiming that Vought should receive further punishment because he was a party to Russell's unwarranted termination. Vought asked Alexander for help defending against those charges and—against his self-interest, as we shall see—Alexander agreed. Reardon was upset by this. He called Alexander and told him Vought was quite capable of representing himself, and it would be a "bad idea" to get involved. On September 26, 2003, the Executive Board held a hearing, following which it voted to suspend Vought's membership for two-and-a-half years. The board found that Vought "plainly and willingly

participated in 'Newell's cynical efforts to manipulate' the entire situation" involving Russell.

Vought filed an appeal shortly thereafter, and the pressure on Alexander, his confidant, increased. Reardon threatened to fire Alexander if he caught him talking with Vought or Newell about Local business, and another union official (apparently a poker fan) flashed his fist in front of Alexander, telling him to watch out for the "five of clubs." Undeterred, Alexander went on to represent Vought at the appeal proceedings before the Joint Council on January 7, 2004. Reardon was visibly upset when he saw Alexander show up for the hearing; meeting with him the next Monday, Reardon told Alexander he couldn't trust him anymore. So Reardon made Alexander keep a minute-by-minute log of all his work activities, something none of the other union employees had to do, and tacked on other administrative burdens. After a few days of this, Alexander resigned, telling Reardon he could see the "[ ]writing on the wall in that he was setting me up to file internal Union charges against me and/or to terminate my employment." A handful more days saw the Joint Council's decision on appeal. Though Reardon took no part in the decision, the suspension of Vought was approved.

Alexander and Vought filed their complaint in federal court the following year. (Newell joined in the suit but is not a party to the appeal.) Suing under the LMRDA, the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, and Wisconsin law, they claimed, as might be expected, that they were forced out in retaliation for blowing the whistle on union impropriety. The district court ruled largely in

favor of the defendants, dismissing the NLRA and state-law claims and all but eliminating the LMRDA claims on summary judgment.[1] The court dismissed Vought's claims on the merits, never reaching that part of Alexander's case because it determined that he failed to exhaust union remedies.

The central question on appeal has to do with the district court's analysis of the LMRDA, but before we get there we must address Alexander's contention that exhaustion would have been futile. He says it would have been pointless to follow the grievance and appeal procedures because the individuals who threatened and harassed him held sway over the Executive Board and the Joint Council. It is true that exhaustion, normally required under § 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), may be excused in the case of futility. But we review a district court's decision requiring exhaustion for an abuse of discretion, and "[t]o convince us that the district court exceeded the bounds of its discretion by not forgiving [his] failure to properly exhaust, [Alexander] must establish that 'union officials [were] so hostile to [him] that [he] could not hope to obtain a fair hearing on [his] claim.'" *Stevens v. Northwest Ind. Dist. Council*, 20 F.3d 720, 733 (7th Cir. 1994) (quoting *Clayton v. UAW*, 451 U.S. 679, 689 (1981)). We are not entirely sure that we would have reached the same conclusion as the district

---

[1] The court did grant summary judgment in favor of Vought on his claim that he was denied a fair hearing before the Executive Board in violation of § 101(a)(5)(C) of the LMRDA, 29 U.S.C. § 411(a)(5)(C). The parties stipulated to damages of approximately $9,000.

court—under one view, the deck was stacked against Alexander—but at bottom we do not believe the court abused its discretion. Recall that Reardon and his allies treated Alexander differently than Vought all along. They never filed charges against Alexander, and they never subjected him to formal discipline—possibly because Alexander played no part in the underlying incident involving Russell and filed no charges of his own. Given these distinctions, it would be reckless to assume that the internal process for Alexander would have been an empty formality like it was, perhaps, for Vought. Stepping back for a moment, though, we should point out that the issue of exhaustion matters little in practice. Had the court excused exhaustion, we are confident that Alexander would have shared Vought's fate on the merits as their claims hinged on the same basic legal question.[2]

Which brings us to the main issue: Did the district court erroneously hold that Vought had no claim under the LMRDA for the loss of appointed union employment, i.e., his business agent position?[3] At first blush, one might think so. Congress passed the LMRDA out of "concern with widespread abuses of power by union leadership," *Finnegan v. Leu*, 456 U.S. 431, 435 (1982), and its provisions speak to

---

[2]   Actually, that may be generous to Alexander. He had another hurdle to clear—establishing constructive discharge—because he was not actually fired.

[3]   Counsel confirmed at oral argument that this appeal is *not* about the loss of union membership or elected office, only the loss of appointed union employment.

that issue. Sections 101(a)(1) and (2), 29 U.S.C. §§ 411(a)(1) and (2), guarantee equal voting rights, and rights of speech and assembly, to "[e]very member of a labor organization"; section 102, 29 U.S.C. § 412, authorizes civil actions for violations of those rights; and section 609, 29 U.S.C. § 529, makes it illegal for a union "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of [the LMRDA]." All this with the overarching objective of "ensuring that unions w[ill] be democratically governed and responsive to the will of their memberships." *Finnegan*, 456 U.S. at 436.

But does the loss of appointed union employment implicate the same concerns as the loss of union membership? The Court in *Finnegan* said no. Considering the statutory language and legislative history, the Court found it "readily apparent . . . that it was rank-and-file union members—*not* union officers or employees, as such—whom Congress sought to protect." *Id.* at 436-37 (emphasis added). The petitioners in that case were fired from their business agent positions after they supported the incumbent (and losing) president in a Local election. The new president showed them the door because he feared they lacked loyalty and "would be unable to follow and implement his policies and programs." *Id.* at 434. The Court found no problem with this decision under any of the provisions mentioned above. Rather, the Court held that the LMRDA does not "establish a system of job security or tenure for appointed union employees." *Id.* at 438. And to the extent the Act limits action taken "as 'part of a purposeful and deliberate attempt . . . to suppress dissent within the union,'" it doesn't do that

at the expense of "the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441 (quoting *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973)).

We took up a similar matter one year later, *Hodge v. Drivers Local Union 695*, 707 F.2d 961 (7th Cir. 1983), to a similar result. The case was slightly unique in that Hodge did not openly oppose the new leadership—she was only terminated because she had worked closely with the opposition in the past—but we found this immaterial. As the Court made clear in *Finnegan*, it didn't matter whether Hodge took sides:

> The crux of the Supreme Court's reasoning in that decision was that the Act "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own" and that a union leader should be able "to select his own administrators" as a way of "ensuring a union administration's responsiveness to the mandate of the union election." 102 S. Ct. at 1873. Open or not, plaintiff's electoral support of the [opposition] apparently led the union leadership to conclude that her "views," however unadvertised, were not "compatible" and thus would interfere with smooth application of the new regime's policy. The rationale of *Finnegan* plainly prevents application of the Act to prohibit the union leadership from acting on such a conviction.

*Id.* at 964.

If these cases left any doubt about the viability of appointed employment claims—and it's hard to see how they

could—we surely erased it in *Brunt v. Service Employees Int'l. Union*, 284 F.3d 715 (7th Cir. 2002). As in *Finnegan* and *Hodge*, the plaintiffs were ousted from their appointed union jobs following an election. Before winning the contest, the incumbent president warned that he would fire anyone who ran against him. The first plaintiff took his chances and ran anyway; the second supported the first; and the third remained neutral in the contest despite the incumbent's admonition that even that could be dangerous to her career. We held that the LMRDA afforded no relief to these individuals because the reelected leader merely exercised his "right to select his own employees." *Id.* at 719. And it mattered not that the plaintiffs lost their contingent membership rights as a result because that was "merely incidental" to the lawful termination of their employment. *Id.* at 720.

Against this precedent, Vought faces an almost impossible task. He must distinguish his plight from *Finnegan*, *Hodge*, and *Brunt*, where nearly all the salient facts remain the same. This, we conclude, he cannot do. Nevertheless, we detect one meaningful difference that bears some discussion.

Resolving this case isn't quite as easy as it seems because—unlike in *Finnegan*, *Hodge*, and *Brunt*—the union leader responsible for the ouster of Vought was *not elected*. If the "primary objective" of the LMRDA is to ensure that unions will be "democratically governed and responsive to the will of their memberships," *Finnegan*, 456 U.S. at 436, then the *Finnegan* rule makes perfect sense—at least where an elected leader does the firing. If the union members choose a new leader on a certain platform, but he is surrounded by the old administration's appointed cronies

supporting conflicting ideas, shouldn't he have the power to replace them? If not, isn't the will of the people—calling for new leadership with fresh ideas—frustrated? Probably so. But are the same concerns at play when the new union leader gains his office not by election but by default, as in this case? Probably not. It is hard to see how democracy is furthered by allowing someone like Reardon, an unelected leader, to fire a business agent.

But these observations do not necessarily mean Vought has a claim. First, there is nothing in the LMRDA that says he does. Second, despite the difference between this case and the *Finnegan* line, ruling against Vought does not run afoul of the controlling precedent. Were we convinced that the action taken was *anti*-democratic, that would change things. For instance, if Vought were an *elected* business agent, it would be difficult—indeed impossible—to sustain the ruling. Under *Sheet Metal Workers v. Lynn*, 488 U.S. 347 (1989), it makes a world of difference if the business representative is elected. "The consequences of the removal of an elected official are much different" because it (1) denies union members "the representative of their choice," and (2) produces a "more pronounced" chilling effect on the exercise of free speech rights. *Id.* at 355. But when the ousted employee secured his job through appointment, not election, these harms are not present.

Perhaps recognizing as much, counsel asks us to look to the fact that Vought *was* elected in some capacity—as the Local's Recording Secretary. Since Reardon terminated the employment of an elected official, this case becomes like *Lynn*. But that logic ignores what Vought actually lost: an

*appointed* job. Nothing in *Lynn* suggests that an appointed business agent is shielded from termination merely because he also happens to hold an elected office. A similar argument was made and rejected in *Finnegan*. "As [union] *members*," the petitioners in that case "undoubtedly had a protected right to campaign" for the losing candidate, but they were not "thereby immunized from discharge at the pleasure of the [new] president from their positions as appointed union *employees*." *Finnegan*, 456 U.S. at 437. Just as "discharge from [appointed] union employment does not impinge upon the incidents of union membership," *id.* at 438, we do not see how it illegally impinges upon the functions of elected office.

Ultimately, the viability of Vought's claim "must be judged by reference to the LMRDA's basic objective: 'to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections.'" *Id.* at 354 (quoting *Finnegan*, 456 U.S. at 441). Though we doubt the termination in this case advanced this objective, we do not believe it thwarted it. And we do not have to agree with the decision to force out Vought to uphold it. Congress decided that the harm that may occasionally flow from union leadership's ability to terminate appointed employees is less than the harm that would occur in the absence of this power. It is not our place to second-guess that legislative judgment. And the possibility that Congress may wish to revisit its assessment in the future—perhaps in response to cases such as this—only underscores that we deal with the law as it is, not as it might be.

We have considered Vought and Alexander's remaining arguments (relating to damages) and find them mooted in part and otherwise unpersuasive.

The judgment of the district court is AFFIRMED.