**UNITED AUTO WORKERS LOCAL 594, Plaintiff–Appellant,**

**v.**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURE IMPLEMENT WORKERS OF AMERICA (UAW), Defendant–Appellee.**

No. 89–2355.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 17, 1991.

Decided Feb. 18, 1992.

Ellis Boal (argued and briefed), Detroit, Mich., for plaintiff-appellant.

M. Jay Whitman (argued and briefed), Associate Gen. Counsel, Intern. Union, UAW, Detroit, Mich., for defendant-appellee.

Paul A. Levy (briefed), Alan B. Morrison (briefed), Public Citizen Litigation Group, Washington, D.C., for amicus curiae.

Before JONES, NELSON and SILER, Circuit Judges.*

DAVID A. NELSON, Circuit Judge.

The Labor–Management Reporting and Disclosure Act of 1959, commonly called the Landrum–Griffin Act, protects labor union members against discrimination in respect of their rights to nominate candidates and vote in union elections. 29 U.S.C. § 411(a)(1); *Calhoon v. Harvey,* 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964). This guaranty of equal voting rights is subject, however, to "reasonable rules and regulations" in the union's constitution and bylaws. *Id.* We focus, in this appeal, on the tension between the statutory guaranty and the statutory qualification.

The plaintiff, a United Auto Workers local union, claims that the defendant international union discriminated against it— and, by inference, against its membership—following an election in which the members of the local chose a slate of convention delegates belonging to a dissident political faction. Unhappy with the results of the election, the local asserts, the international manufactured a pretext for having its credentials committee order a second election. The same slate was elected in the rerun. The international required the local to bear the cost of that election, however, and the local wants the courts to shift the cost to the international.

Under its constitution, the international must reimburse a local for the cost of repeating an election if the full membership of the convention reverses the credentials committee. Here the convention voted to uphold the credentials committee. The vote of the convention left the local with expenses said to exceed $80,000.

The district court decided that it was immaterial whether, as the plaintiff local alleged, the defendant international had both concocted a fictitious protest of the first election as an excuse for holding a second one and deceived the convention when the matter came before that body for review. The court decided that the pertinent rules of the UAW constitution were "reasonable" under 29 U.S.C. § 411(a)(1), and the court viewed this as dispositive.

* The Honorable Eugene E. Siler, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, sat by designation at the time of argument. Judge Siler became a member of this court on September 16, 1991.

Denying a request for a continuance so that the plaintiff could attempt, through discovery, to supplement some rather sketchy evidence suggestive of purposeful and deliberate misconduct, the district court entered summary judgment in favor of the defendant international a few weeks after the filing of the complaint.

We conclude that the entry of summary judgment was premature. Although we agree that the rules of the UAW constitution are reasonable on their face, we do not believe that this gives the union license to apply the rules in such a way as to violate the statutory rights of the membership. *Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24–P*, 473 F.2d 359, 363 (6th Cir.1973). The case at bar was not ripe for summary judgment, in our view, and we shall therefore vacate the judgment and remand the case with instructions to allow reasonable discovery.

## I

In January of 1989 the UAW international union issued a call to its locals for a constitutional convention to be held that June in Anaheim, California. Pursuant to the UAW constitution, the locals were to hold elections for convention delegates.

The president of Local 594, Donald Douglas, promptly announced his candidacy for a regional directorship that was to be filled at the convention. Mr. Douglas was associated with a dissident faction called the "New Directions" movement. His announced opponent was associated with the "Administration Caucus," as were the international's president, Owen Bieber, and all but one of the members of the international's executive board.

The contest between Mr. Douglas and his opponent for the regional directorship became a central issue in the local election for convention delegates. Mr. Douglas headed a 13–person slate of candidates all of whom were pledged to support him for the directorship in opposition to an Administration Caucus candidate.

Local 594 held its election for convention delegates in March of 1989. The members of the Douglas slate won by margins on the order of four to one.

While the election was in progress, a candidate named Wilma Jean Mansfield, who was running on a different slate, presented a handwritten protest at the local union hall. Ms. Mansfield's protest stated simply that her "cards" were not posted in the voting booths. (The cards in question evidently listed Ms. Mansfield's independent slate of delegates.) The local recognized that there had been a mistake and corrected it.

A typewritten protest purporting to have come from Wilma Jean Mansfield was sent to the international union's secretary-treasurer a few days after the election. In addition to complaining about the absence of Ms. Mansfield's cards, this protest alleged that New Directions personnel had harassed Mansfield supporters, had passed out New Directions literature within ten feet of polling places, and had distributed union membership cards (possession of which was supposedly necessary to vote) enclosed in New Directions pamphlets.

Ms. Mansfield has executed a short affidavit swearing that she did not sign the second protest. Although it bears a signature reading "Jean Mansfield," the signature is not hers.

Another unsuccessful candidate, Anthony Q. Jones, filed a protest the authenticity of which has not been questioned. His protest dealt with (1) extensive pro-Douglas advertising on jackets, T-shirts and buttons worn by union representatives, (2) inconsistent handling of ballots cast by voters without union cards, and (3) procurement of union cards by "runners," union representatives who would go from the polling places to the union hall to get union cards typed up for prospective voters who could not produce such cards.

During the month following the election, Maurice Treadwell, an administrative assistant to Owen Bieber, sent letters to Local 594 over Mr. Bieber's signature enclosing copies of Mr. Jones' protest and the purported protest of Ms. Mansfield. The local was requested to submit written statements presenting its position relative

to both protests; the local did so, presumably confining itself to matters discussed in the protests themselves.

Mr. Treadwell furnished copies of the protests and the local's responses to a credentials committee that was appointed in May by the international's executive board. The members of the credentials committee (all but one of whom, Joseph G. Smith, were members of the Administration Caucus) held their first meeting on May 24, 1989. The committee ultimately reviewed protests relating to 66 different elections across the country, and decided in all but two of these cases that only evidence submitted with the protests and the local union responses would be considered.

When the credentials committee reached the purported protest of Wilma Jean Mansfield, as it did on May 25, the committee was apparently given to understand, contrary to the fact of the matter, that the protest had been accompanied by a copy of the February issue of the "Champ," a monthly newspaper published by Local 594. It is undisputed that a copy of the newspaper was among the documents placed before the committee; Mr. Treadwell may know how it got there, but we do not. Ms. Mansfield's affidavit says that she signed only one protest—the handwritten complaint about the absence of cards—and this protest had no attachments.

Regardless of where the newspaper came from, its authenticity has not been questioned. Inside the paper were various notices pertaining to the upcoming election and a copy of the election rules. On the front page, accompanied by a photograph of Don Douglas, was an article by Mr. Douglas in which he complained that General Motors was "whipsawing" local unions into making concessions. The article concluded with this rhetorical question: "Are we really going in the right direction?" A second front page article reported on a UAW meeting, chaired by Mr. Douglas, at which "over 800 UAW members met to discuss their problems and views and to urge the International leaders to take tougher stands against employers." The paper did not identify any slate of candidates or overtly solicit votes for any particular group.

Taking the position that the content of the newspaper was improper, the credentials committee voted to require Local 594 to conduct a new election for convention delegates. Mr. Douglas was told of the committee's action on May 26, and the decision was formally memorialized in a letter the committee sent Mr. Douglas under date of June 1, 1989. After referring to the protests in question, the letter stated that

"Accompanying the Mansfield protest was an advertisement in the February issue of the Local Union newspaper ('*Champ*') which factually advertised and solicited votes from the membership on behalf of the Don Douglas slate of candidates.

\*     \*     \*     \*     \*     \*

Albeit, the other issues contained in the appeal are controversial and raise serious concern as to propriety, it is undisputed that the referenced Local Union newspaper advertisement existed, was broadly distributed to the membership, was purely political in nature and constituted a grave violation of the UAW constitution.

\*     \*     \*     \*     \*     \*

In view of the foregoing comments, the Credential Appeals Committee is ordering a new election for Delegates to the 29th UAW Constitutional Convention at Local 594."

In response to the June 1 letter, Mr. Douglas told the credentials committee that the newspaper had never been the subject of an election protest; that no copy of the newspaper had been attached to any appeal; and that in any event the newspaper neither identified a Douglas slate of candidates nor solicited votes for it. Mr. Douglas requested an opportunity to meet with the committee to clarify the matter.

What happened next, according to an affidavit subsequently signed by Mr. Smith, the committee's sole New Directions member, was that the credentials committee asked Mr. Treadwell to determine whether the newspaper had actually been attached

to the Mansfield protest. Mr. Treadwell reported back that a secretary in his office had verified that it was. On the basis of this information, the committee adhered to its original decision and declined to meet with Mr. Douglas.

As ordered by the credentials committee, Local 594 conducted a second delegate election on June 13–14. The results of the second election were comparable to those of the first; the Douglas slate won by a landslide.

The convention assembled at Anaheim on June 18, 1989. Among the first items of business was the presentation of a report by the credentials committee. The report stated that 762 local unions had returned 2086 delegate credentials; that the committee had received 66 protests; and that after a review of the protests and the responses requested by President Bieber's office, and after conducting supplemental investigations where necessary, the committee had ordered 12 new elections.

The report went on to provide details on a large number of individual protests, including those attributed to Ms. Mansfield and Mr. Jones at Local 594. The report advised the convention that a copy of the February edition of the local union's newspaper had been attached to the Mansfield protest and was considered by the committee in conjunction with Mr. Jones' objections to "extensive use of advertising by the local." The convention was told further that "[b]ased on the February edition of the local union newspaper which attacks the opposition's point of view and contained numerous articles, advertising and promoting the positions of Candidate Douglas and his supporters, your committee has approved this protest and directed a rerun election."

After the report of the credentials committee had been completed, along with a minority report not directly relevant here, Mr. Douglas took the floor to move, pursuant to Article 8, Section 17 of the UAW Constitution, that the convention overturn the credentials committee's decision with respect to the Local 594 election.[1]

Mr. Douglas did not challenge the authenticity of the Mansfield protest; he was not then aware, he says, that the signature on the protest was not hers. He did argue, however, that the credentials committee's proffered reason for setting aside the initial election was without merit: "There is absolutely no bona fide evidence [of improper advertising]," Mr. Douglas told the convention, referring to the *"Champ"* and explaining that it contained no delegate advertising. He concluded with a request "under Article VIII, Section 17(C) of the UAW Constitution that you reject the majority report in reference to Local 594 and let the original election stand as is." (Rejection of the majority report, as noted above, would have entitled the local to reimbursement of the costs of the second election.)

After further debate, in which there was no discussion of the specifics of the presentation made by Mr. Douglas, the acting chairman of the convention explained that there would be a separate vote on the request of Local 594. A transcript of the proceedings says that on a show of hands, the "[m]otion of Local 594 [was] overwhelmingly defeated." The majority report of the credentials committee was then accepted in its entirety, again "overwhelmingly."

Within a month, counsel for Local 594 sent a letter to the Department of Labor protesting the decision of the convention. The protest was being filed, the letter ex-

---

1. Article 8, Section 17(b) authorizes the credentials committee, acting jointly with the international's president, to order a rerun of any local union election where the credentials committee decides that the election has been conducted improperly and that delegates elected therein should not be seated. Section 17(c) provides that if the convention approves a rerun decision, the delegates elected in the rerun shall be seated if confirmed by the committee and the convention. Section 17(c) then goes on to provide as follows:

"If the Convention should reverse the Credentials Committee and approve the initial election, the delegates elected at such initial election shall be seated and the International Union shall reimburse the Local Union for the costs of rerunning the election."

plained, in the event that the department proved to have jurisdiction to entertain it under Title IV of the Landrum–Griffin Act, 29 U.S.C. §§ 481 *et seq.* The Department of Labor ultimately concluded that the local's protest did not come within the department's jurisdiction.

## II

Without waiting for final word from the Department of Labor, Local 594 commenced the present action by filing a complaint against the international union in the United States District Court for the Eastern District of Michigan. The defendant international filed an answer the following week, and moved for summary judgment a week after that. The motion was supported by an affidavit in which Maurice Treadwell explained the procedure that had been followed.

The summary judgment motion asserted, among other things, that Local 594 had no standing to sue under the Landrum–Griffin Act because the local was not a labor union "member" with rights protected under 29 U.S.C. § 411. (See, *e.g.*, § 411(a)(1): "Every *member* of a labor organization shall have equal rights ... to vote in elections...." (emphasis supplied).) Not being a "member," the argument ran, the local was not a "person whose rights [under § 411] have been infringed"—and only such persons may sue for relief under 29 U.S.C. § 412.

In an attempt to solve the problem of standing, the local moved for leave to file an amended complaint naming three individual members as additional parties plaintiff. The proposed amendment alleged that the three individuals faced increased dues or decreased services because of the local's expenditure of funds to conduct the second election. The pleading also alleged that the three individuals were fearful of reprisal if they supported anti-Administration Caucus candidates in the future.

A brief in opposition to the summary judgment motion was timely filed, accompanied by affidavits from Donald Douglas, Wilma Jean Mansfield and Joseph G. Smith. Among the exhibits attached to the Douglas affidavit was the February issue of the *"Champ."* The local also served the defendant international with written interrogatories and requests for production of documents.

The district court heard oral argument on the pending motions some eight weeks after the filing of the complaint. The argument took place before Local 594 had received any response to its discovery requests. Counsel for the local asked the court to defer its ruling on the summary judgment motion until discovery (including the deposition of Mr. Treadwell) could be had, but the court declined to wait.

Against this background, obviously, it was incumbent on the district court to be particularly careful to give the plaintiff the benefit of every factual inference that could fairly be drawn from the papers that had been filed. In reviewing the matter *de novo*, it is incumbent on us to do the same. We must read the plaintiff's claim as we would read poetry—with "a willing suspension of disbelief."

If the plaintiff local is to be believed, its members were required to vote a second time solely by reason of having voted wrong the first time. Because a majority of the local's members voted for the New Directions slate, we are invited to infer, someone working for the international maliciously filed a fictitious protest of the election, misusing Wilma Jean Mansfield's name in doing so, and attempted to support this fabricated protest with over-the-transom evidence which, on its face, disclosed no impropriety at all. The February issue of the *"Champ"* does not constitute an "advertisement" for any slate of candidates, Local 594 insists, and it should have made no difference in any event; locals that voted for Administration Caucus candidates were not required to rerun their elections even though their newspapers openly endorsed such candidates. The professed reason for the rerun, in short, was a sham and a fraud; the real reason was anti-New Directions animus.

The international union responded that the merits of these contentions were simply

not material. If the Mansfield protest was a fabrication, the international argued before the district court, Local 594 should have found it out in time to lay the facts before the credentials committee and the full convention. Regardless of whether the credentials committee acted properly, the international maintained, the action taken by the convention in sustaining the credentials committee was dispositive.

The international pointed out that the convention is its "highest tribunal." See Article 7, Section 1(a) of the UAW Constitution. Under Article 8, Section 17 of the constitution, it was the convention that had the final say on who was to bear the costs of the second election. The equal voting rights secured by 29 U.S.C. § 411(a)(1) are, as we have seen, "subject to reasonable rules and regulations in [the union's] constitution and bylaws;" citing *Millwright Local #1079 v. United Brotherhood of Carpenters and Joiners of America*, 878 F.2d 960 (6th Cir.), *cert. denied*, 493 U.S. 965, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989), the international argued that the rules contained in the UAW constitution are "reasonable." If the rules are reasonable, the international submitted, "[t]hat ends the inquiry."

The district court accepted this argument. Whatever the deposition of Mr. Treadwell might have shown, the court concluded, the international would still be entitled to judgment as a matter of law. Ruling from the bench, the court expressed itself as follows:

"Now clearly under the UAW Constitution the Credentials Committee had the power to order a new election if they thought the election was rigged or improperly run, and they did so. Their action was taken to the floor of the convention and the New Directions people had every opportunity to be heard on the action of the Credentials Committee. There was debate on the floor of the convention and eventually the convention voted, which is the ultimate authority in the UAW, voted to uphold the Credentials Committee's action.

\*      \*      \*      \*      \*      \*

I think based upon the fact that the convention took the action it did after full action by the Credentials Committee, after the Credentials Committee had its report on the floor, after ... its recommendations had been fully debated by the convention on the floor of the convention and adopted, ... nothing having been filed to ... refute the fact that it was a valid convention, and that the action of the Credentials Committee was reasonable, I think I have to grant the motion. I don't think the function of the federal court is to get into the operation of a Credentials Committee and knit-pick [sic] it and to look at everything they do and try to secondguess them, that is not this Court's function. I will grant the motion."

The bench ruling was subsequently incorporated in a written judgment dismissing the complaint in its entirety and denying as moot the motion for leave to file an amended complaint. From this judgment Local 594 perfected a timely appeal.

### III

Deferring, for the moment, our discussion of standing, we turn to the effect of the vote on the floor of the convention.

■ It is perfectly reasonable, of course, for an international union to have a constitution saying, as the UAW's does, that the international's highest tribunal shall be a convention composed of delegates democratically elected by the membership of the local unions. It is likewise reasonable to provide, as the UAW constitution does, that the validity of local delegate elections shall be subject to review by a credentials committee, that the credentials committee and the international president may order such elections to be rerun, and that the convention itself shall be the final authority within the union on questions of which delegates are to be seated and which union entity is ultimately to bear the cost of a rerun.

We do not believe that this ends the inquiry, however. The fact that it is reasonable for the convention to have the final say within the union does not mean that the convention, when it speaks for the un-

ion, can countermand the directives of Congress. As we said in *Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24-P*, 473 F.2d 359, 363 (6th Cir. 1973), a union "is not free to apply its rules in such a way as to violate the rights which Congress has secured to every member of a labor organization."

■ Among the rights which Congress has secured to every member of the UAW are "equal" voting rights. 29 U.S.C. § 411(a)(1). Implicit in the concept of equal voting rights, we believe, is the notion that no union member can be penalized or subjected to reprisal, directly or indirectly, because he or she voted for dissident candidates. See *Calhoon v. Harvey*, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964) (stating that § 411(a)(1) is "a command that members and classes of members shall not be discriminated against in their right to nominate and vote"). It would hardly be treating voters equally for an international union to say that the membership of locals that elect dissident candidates can expect to see their locals saddled with election costs not imposed on locals that elect majority candidates.

If further confirmation of this reading of 29 U.S.C. § 411(a)(1) be needed, it can be found in 29 U.S.C. § 481(e). The latter section—enacted as part of Title IV of the Landrum–Griffin Act—is *in pari materia* with Title I, the title that enacted the "Bill of Rights" of which § 411(a)(1) is a part. Section § 481(e) says in so many words that "every [union] member in good standing ... shall have the right to vote for ... the candidate or candidates of his choice, without being subject to penalty ... or reprisal of any kind...."[2] The emphasis of Title I is directly comparable; Title I "placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union...." *Fin-*

*negan v. Leu*, 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982); *cf. Cehaich v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, 710 F.2d 234, 237 (6th Cir.1983).

■ A union constitution can no more authorize a democratically elected convention to impose illegal sanctions than it can authorize an instrumentality or agent of the convention to do so. Suppose the 1989 UAW convention had passed a resolution expressly declaring that Local 594 would have to bear the cost of the second election for no other reason than that New Directions delegates had been chosen in the first election; could such a blatantly unreasonable and discriminatory resolution pass muster under 29 U.S.C. § 411(a)(1) merely because the rules and regulations under which it was adopted were not themselves unreasonable? We think not.

Nothing in *Millwright Local #1079 v. United Bhd. of Carpenters and Joiners of America*, 878 F.2d 960 (6th Cir.), *cert. denied*, 493 U.S. 965, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989), suggests otherwise. That case stands for the proposition that a union's "interpretation" of its constitution (and, presumably, its application of the constitution as well) will not be upset by the courts unless it is unfair or unreasonable. *Id.* at 962. The constitutional provision at issue in *Millwright Local #1079* gave the international union's general executive board the final say within the union on the matter challenged by the plaintiff local, but this provision—while not itself unreasonable—did not prevent us from scrutinizing the merits of the plaintiff local's claim that its members had been effectively denied their right to vote. See *id.* at 963–64.

---

2. The Secretary of Labor has statutory authority to bring suit to set aside an election that is invalid under § 481(e)—see 29 U.S.C. § 482(b)—and 29 U.S.C. § 483 makes this the exclusive mechanism for challenging an election already conducted. The defendant international does not argue on appeal that the local's lawsuit constitutes such a challenge, so we need not decide whether § 483 bars this lawsuit. The

Supreme Court has told us that § 483 does bar Title I relief when a union member makes a direct challenge to the validity of an election that has already been completed, *Local No. 82 v. Crowley*, 467 U.S. 526, 541, 104 S.Ct. 2557, 2566, 81 L.Ed.2d 457 (1984), but § 483 does not necessarily bar such relief when the validity of the election is not challenged "directly." *Id.* at n. 16.

■ In the case at bar, to be sure, the vote of the convention to accept the decision of the credentials committee with respect to Local 594 may not have been unfair or unreasonable on its face. It may well turn out, moreover, that there was in fact no "purposeful and deliberate attempt by union officials to suppress dissent within the union"—an essential element, according to at least one court, of an action brought to vindicate Title I rights. *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973). But if union officials did, in fact, maliciously file a false election protest because they did not like the results of the election, and if they let the convention act without disclosing what they had done, we are not prepared to say that there could have been no violation of the Landrum–Griffin Act.

■ We are not unmindful of the importance of avoiding unnecessary judicial involvement in internal union affairs. See *Corea v. Welo*, 937 F.2d 1132, 1135 (6th Cir.1991). Congress unquestionably regarded the desire of unions to maintain control over their own affairs as legitimate. *United Steelworkers of America v. Sadlowski*, 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982). The district court was right to be chary of nitpicking the operations of the credentials committee and second guessing the union decision makers on questions best left to them. But the conduct charged in this case is so unconscionable, we believe, that if the charge were true, the defendant's bad faith would strip away the protection from judicial interference to which the union would be entitled otherwise.

Mere conclusory allegations cut no ice in summary judgment proceedings, of course, but the plaintiff local did present at least a modicum of evidence suggesting a possibility of serious intentional misconduct. There was enough such evidence, we believe, to make it reasonable for the local to want to take Mr. Treadwell's deposition after receiving responses to the interrogatories and requests for production of documents.[3] There had not been a significant opportunity for discovery by the time of the summary judgment hearing, and this problem should have been dealt with by granting the local's request for a continuance. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (premature motion for summary judgment may be dealt with by ordering a continuance or other appropriate action under Rule 56(f), Fed.R.Civ.P., "if the nonmoving party has not had an opportunity to make full discovery.").

## IV

■ We come, at last, to the question of standing. It will not detain us long.

Our circuit has recently held that 29 U.S.C. § 412 does not confer standing to sue for violations of § 411 on anyone other than rank-and-file union members. *United Bhd. of Carpenters and Joiners of America, Dresden Local No. 267 v. Ohio Carpenters Health and Welfare Fund*, 926 F.2d 550, 557 (6th Cir.1991). The "basic objective" of the Landrum–Griffin Act, as the Supreme Court said in *Sheet Metal Workers' Int'l Assoc. v. Lynn*, 488 U.S. 347, 354, 109 S.Ct. 639, 644, 102 L.Ed.2d 700 (1989), is "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Id.*, quoting *Finnegan v. Leu*, 456 U.S. 431, 441, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982). In *United Bhd. of Carpenters and Joiners*, we said that

"We do not see how extending to component units within a labor organization the rights of members secured by the [Landrum–Griffin Act] would advance union democracy or protect the right of individual members to participate in union deliberations and governance. * * * If an individual member is aggrieved ... there are other, and better, means for assert-

---

**3.** We do not intend, obviously, to cast any aspersions on Mr. Treadwell's character. There is little objective reason to suppose that he did anything wrong, and we should be surprised if the deposition did not show him to have been blameless. It would be better to find out, however, than to rest on speculation.

ing those grievances. Courts will scrutinize such measures for violations of the statutory rights of members ... in an appropriate action by those members...." 926 F.2d at 556.

In the case before us an effort was made to join three rank-and-file members of Local 594 as parties plaintiff a week before the district court heard oral argument. The proceedings were at such an early stage that it is most unlikely that the defendant would have been prejudiced by the granting of leave to amend. The proposed amendment set forth facts sufficient, in our view, to confer standing on the individual union members, and if there was any merit in the theory on which the case had been brought, allowance of the amendment would obviously serve to "advance union democracy" and "protect the right of individual members to participate in union deliberations and governance."

The district court denied the motion for leave to amend as moot. Our disposition of the appeal means that the motion can no longer be considered moot. Absent some development we do not now foresee, we assume that the motion will be granted by the district court following the remand.

For the reasons stated, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.