Janet K. HODGE, Plaintiff-Appellant,

v.

DRIVERS, SALESMEN, WAREHOUSE-MEN, MILK PROCESSORS, CANNERY, DAIRY EMPLOYEES & HELPERS' LOCAL UNION 695, et al., Defendants-Appellees.

No. 82–2555.

United States Court of Appeals,
Seventh Circuit.

Argued April 14, 1983.

Decided May 25, 1983.

* The Honorable Robert A. Grant, United States Senior District Judge for the Northern District of Indiana, is sitting by designation.

Daphne Webb, Jacobs, Webb & Weiden, Madison, Wis., for plaintiff-appellant.

Marianne Goldstein Robbins, Goldberg, Previant, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, Wis., for defendants-appellees.

Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This appeal challenges the district court's finding that plaintiff, a union secretary who had wide-ranging responsibility and access to confidential union information and who was fired for her perceived lack of loyalty to the newly elected union administration, is not a "nonconfidential employee" who may be entitled to recover under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 411, 412, as interpreted by the Supreme Court in *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 1873 n. 11, 72 L.Ed.2d 239 (1982). We affirm.

I.

The relevant facts are largely undisputed. Plaintiff was employed as a secretary of the defendant union local and its predecessor for a period of fourteen years until 1974, and was a union member for the latter twelve. During the last six years of her employment, plaintiff was head secretary and had supervisory authority over other clerical workers who, according to her supervisor, "looked up to her because . . . in the Local she knew more about what went on. . . ." Plaintiff also acted as personal secretary to two successive Secretary-Treasurers of the union, Al Mueller and Don Eaton. As Eaton's personal secretary, responsible for his schedule and correspon-

dence, plaintiff had special access to Eaton, allowing her at times to bypass her immediate superior. Plaintiff also had close personal ties to Eaton and other union officials with whom she discussed union business to the point that "if there was something that somebody wanted to mention, certainly did not [sic] feel they couldn't say that to me." In the course of her routine work, plaintiff also had most of the clerical contact with the office's confidential and sensitive information (although the record does not establish that other clerical workers were specifically forbidden from handling the same information and in fact some apparently did have such contact). Examples of plaintiff's contact with sensitive information included her preparation of membership meeting minutes and the typing of confidential documents which were at the heart of the union's strategic functioning: strike sanctions, internal union charges against employees, unfair labor practice charges against employers, collective bargaining contract proposals, and the roster of employees who had authorized deduction of union dues from their paychecks. Plaintiff's telephone and mail responsibilities also gave her access to strategically sensitive information; she received the incoming calls of the union's several business agents which discussed sensitive strike and bargaining information concerning the 220 represented bargaining units and even touched on internal criticisms of the actions of some of the agents. In addition, plaintiff had primary custody over the "Steward's Book" containing the names and locations of union committee members and stewards; the book was specifically designated as confidential to her and was kept under lock and key and also on magnetic tape accessory to plaintiff's typewriter.

In 1973, and ostensibly as a result of a heated dispute between the union local for which plaintiff worked and its national Teamster parent concerning the mis-handling of strike benefits by the local, the local was placed under national Teamsters trusteeship, pursuant to the union's constitution. Consequently, Secretary-Treasurer Eaton was effectively displaced by a Teamster official and the local's business agents were asked to resign and most were not rehired; however, the remainder of office employees, including plaintiff, were told by the trusteeship that their tenure would be secure if they performed in a satisfactory manner. Plaintiff continued her previous role, with somewhat curtailed authority, although the record does not indicate that she was no longer privy to confidential and sensitive information. Shortly thereafter, a group of dissident rank and file members and previous business agents of the local, including some with whom plaintiff had close relations, organized as Teamsters for Democracy (TFD) to challenge the trusteeship through litigation and electoral means. In the December, 1974 union election, TFD fielded its own slate of candidates against the trusteeship-imposed officials; the leading members of the TFD slate were two candidates with whom plaintiff had a close friendship and a previous close working relationship. However, plaintiff did not openly participate in TFD's efforts but rather strived to remain outwardly neutral as between the slates. Nevertheless, after the trusteeship-imposed incumbents won the election, and despite plaintiff's attempts to convey neutrality, the victorious administration believed that plaintiff had voted for the TFD slate and thus announced its intention to "get rid of" her. Subsequently, plaintiff and all of the employees of the local were fired and instructed to speak with the president-elect about rehiring. When plaintiff asked to be rehired, her request was refused although the new union administration did not cite any deficiency in her past performance; instead, the new officers stated that she would not be rehired due to her support for the TFD.[1]

---

1. Defendants challenge as clearly erroneous the district court's finding that plaintiff was fired for her political differences with the incumbent administration. However, the district court explicitly based its assessment of the conflicting evidence on this issue on what it perceived to be the greater credibility of plaintiff's testimony. In such a posture, we must defer to the court's findings. *Trabert and Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 479 (7th

In 1976, after plaintiff had secured another job, the new administration offered her a job, but later changed its mind again and withdrew the offer.

Plaintiff then sued for reinstatement and back pay, alleging that she had been discharged in violation of Section 101(a)(1) and (2) and Section 609 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411(a)(1), 411(a)(2), 529. The former two provisions grant union members the right to exercise full electoral and political rights, while the latter provision makes it unlawful for a union to "discipline" any of its members for exercising their rights under the Act. Several months after a bench trial on plaintiff's claims, the Supreme Court issued its opinion in *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), which rendered a comprehensive interpretation of the scope of claims such as those asserted by plaintiff. The district court accordingly applied those principles to plaintiff's action. First, since *Finnegan* squarely held that Section 609 of the Act does not cover removal from union employment but only "punitive actions diminishing membership rights," 102 S.Ct. at 1871, 1872, and plaintiff did not allege any impact on her rights as a union *member,* the district court found that no claim could be properly stated under that Section. Plaintiff does not appeal this part of the district court's disposition below.

What plaintiff does challenge is the district court's finding that *Finnegan* precluded her claim from being cognizable under Sections 101(a)(1) and (a)(2) of the Act. With respect to these sections, the Supreme Court in *Finnegan* held that whatever limits they may place on a union's authority to dismiss union officeholders as part of an attempt to suppress dissent, they "[do] not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." 102 S.Ct. at 1873. The Court based this conclusion on its finding that

neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage. To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections.... Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election.

*Id.* Thus, the Court found nonactionable the union's dismissal of its former business agents who had "significant responsibility for the day-to-day conduct of union affairs." However, while thus generally eliminating Section 101(a)(1) and (a)(2) as a basis upon which to obtain redress for political discharge from union employment, the Court explicitly left "open the question whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees." 102 S.Ct. at 1873 n. 11.

The proper application of the word "nonconfidential" as used in this footnote has proven to be the fulcrum of this case. The district court concluded that the Supreme Court's reservation did not apply to the plaintiff, reasoning that

plaintiff, in her role as head secretary, had access to and regular contact with confidential information regarding union affairs. In the [Supreme] Court's view, such an employee, though not involved in policymaking, plays an important role as part of the staff employed by an elected union leader. As with business agents, the loyalty of such a person to the elected union leadership is important to the day-to-day effectuation of the union's business.

Thus, having found plaintiff to be a "confidential" employee within the Supreme Court's intended meaning, the district court

ruled that the *Finnegan* "union employee" exception precluded her claim under Section 101(a)(1) and (a)(2) of the Act.

## II.

On appeal, plaintiff argues that the district court erred in applying *Finnegan* to the case at bar. As an initial matter, she claims that *Finnegan* is factually distinguishable. First, she argues, *Finnegan* involved the dismissal of a union employee who had campaigned *openly* against the new administration, while plaintiff here remained neutral. Second, she avers, *Finnegan* involved the dismissal of employees who were felt to be loyal to the previous administration and therefore unable to implement the new administration's differing policy, while here the dismissal was only in retaliation for plaintiff's exercise of membership voting rights rather than due to any suspected conflict of loyalties on the job.

We think that these purported distinctions are without merit or support. As to the first, it is difficult to see why the openness of the discharged employee's support matters under the *Finnegan* rationale. The crux of the Supreme Court's reasoning in that decision was that the Act "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own" and that a union leader should be able "to select his own administrators" as a way of "ensuring a union administration's responsiveness to the mandate of the union election." 102 S.Ct. at 1873. Open or not, plaintiff's electoral support of the TFD apparently led the union leadership to conclude that her "views," however unadvertised, were not "compatible" and thus would interfere with smooth application of the new regime's policy. The rationale of *Finnegan* plainly prevents application of the Act to prohibit the union leadership from acting on such a conviction.

Second, plaintiff claims that she was discharged here not for conflicting loyalties but merely to make an "example" of what happens to members supportive of dissidents, thus infringing her rights as a union *member,* rights which are still within the ambit of Section 101(a)(1) and (a)(2) even after *Finnegan.* It is true that the district court did not state in so many words that the fear of debilitating intra-office friction rather than a general desire to punish enemies caused the dismissal of plaintiff, but such a view is obviously implied in the district court's finding that the union expressed a need to "clean house" after the election and thus "dismissed plaintiff ... for political reasons." There is ample evidence in the record to support this finding of a primary concern with the political allegiance of staff *qua* staff, including direct testimony that plaintiff's continued employment did not "fit into the plan" to overcome "internal struggle" and "put this Local back in shape and return it to the membership as it should [sic]. . . . "

We are left, then, with plaintiff's major argument: that the district court erred in concluding from the facts that plaintiff was a "confidential" union employee to whom the barriers of *Finnegan* applied. Chiefly, she argues that her duties were routine in nature, unlike the sensitive duties of business agents or other first-line policymakers which were involved in *Finnegan* and cases cited therein. But we think this distinction goes more to the non-"policymaking" half of the Supreme Court's *Finnegan* reservation, not its independent and conjunctive "nonconfidential" employee requirement. It was undisputed here that as part of her routine duties plaintiff had wide-ranging visual and telephone access to sensitive material concerning vital union matters such as internal union complaints, strike and organizing status and strategy, lists and locations of union activists and stewards, unfair labor practices charges, collective bargaining agreement proposals, and the affairs and performance of the union's business agents—all information whose nondisclosure plaintiff acknowledged was crucial, especially in a partisan context like the trusteeship. Nothing suggests to us that her position was less "confidential" because it carried the unadorned title of "secretary;" indeed, *Finnegan* by its very terms is not limited to powerful decisionmakers but includes "administrators" and "staff." Plain-

tiff relies on First Amendment cases such as *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) holding that certain judicial personnel and an assistant public defender do not occupy positions so "confidential" as to warrant their dismissal for holding differing political views. But these cases are inapposite, for they rest on the inappropriateness of certain kinds of "confidentiality," *i.e.* political uniformity and patronage, in the context of public civil service. By contrast, the Supreme Court in *Finnegan* noted that the Labor Management Reporting and Disclosure Act was not intended to address the issue of patronage, 102 S.Ct. at 1873, and, indeed, labor unions, as centers of highly politicized "countervailing power" rather than public bodies expected to act disinterestedly, would seem to be better left wide discretion in ensuring political solidarity in their administrative operations. 102 S.Ct. at 1873; *see also* Lindbloom, Politics and Markets 115 (1977). The better view of "confidential" status in the industrial relations employment context is, we think, stated in *Teledyne Dental Products Corp.,* 210 NLRB Dec. (CCH) 435, 441 (1974), where a nonsupervisory personal secretary to a plant manager was held to be a confidential employee whose conduct was attributable to the employer.

In sum, where, as here, the plaintiff has such wide access to confidential and sensitive union information, the district court properly found that plaintiff did not qualify for the "nonconfidential" employee reservation left open in *Finnegan.*

For the foregoing reasons, the district court's entry of judgment in favor of defendants is affirmed.

AFFIRMED.