Lydia KORZEN and Marsha O'Brien, Plaintiffs,

v.

LOCAL UNION 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendant.

No. 93 C 3090.

United States District Court, N.D. Illinois, Eastern Division.

March 28, 1994.

---

Robert Ronald Tepper, Law Offices of Robert R. Tepper, Chicago, IL, for plaintiffs.

Thomas Deacon Allison, Michael H. Slutsky, Cotton, Watt, Jones & King, Sherman M. Carmell, Adrianne Edith Hampo, Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Lydia Korzen and Marsha O'Brien bring this eight count complaint, alleging violations of the Labor Management Relations Act, Title VII, and the Equal Pay Act. Presently before the court is defendant Local Union 705, International Brotherhood of Teamsters' motion for summary judgment. For the reasons set forth below, defendant's motion is granted in part and denied in part.

### I. Background

Plaintiffs Lydia Korzen and Marsha O'Brien bring this action challenging the termination of their employment by defendant Local Union 705, International Brotherhood of Teamsters ("Local 705").[1] The circumstances surrounding the termination of each plaintiff will be discussed individually.

#### A. Lydia Korzen

Local 705 hired Korzen as a clerical worker in 1977, and in September, 1986, she became a secretary for Daniel Ligurotis, who was Secretary–Treasurer of the Union. She remained in that position until March 1, 1993, approximately two and one half weeks after Ligurotis was removed from office. At that time, Korzen was reassigned to the Local 705 Health and Welfare Fund, where she worked as a claims adjuster trainee. In that position, she was required to perform "kitchen duty." This obligation essentially required all women employees, other than the Secretary–Treasurer's secretaries and supervisors, to participate in cleaning the "girl's kitchen."[2] When Korzen began working as a claims adjuster trainee, there was no similar duty for Local 705's male employees, whose kitchen was cleaned by the janitorial staff.

On March 4, 1993, Korzen met with the new Secretary–Treasurer, Gildo Valerio, and informed him that she was unwilling to perform kitchen duty because she did not use the kitchen. Indeed, she filed a grievance with the Local 705 Executive Board, contesting, among other things, the kitchen duty requirement. This grievance was denied as meritless. She also filed a charge with the Equal Employment Opportunity Commission on March 24, 1993, challenging the differential treatment of men and women with respect to kitchen duty. Notwithstanding her objections, Korzen was again scheduled for kitchen duty for the week of May 3, 1993; however, as she was scheduled to be on vacation during that week, her supervisor, Mary Kwiecien, asked if she would switch weeks with another employee. Korzen refused. When Korzen returned to work on May 10, 1993, Kwiecien requested that she perform kitchen duty that week, but again Korzen refused. Valerio, who had been informed of Korzen's refusals, instructed Kwiecien to put Korzen on the kitchen duty list for the week of May 17, 1993. On May 14, 1993, Valerio instituted kitchen duty for male employees, and instructed Kwiecien to inform Korzen. Kwiecien met with Korzen, informed her that men would be required to perform kitchen duty, and asked her if she would perform kitchen duty the following week as assigned. Korzen attempted to call her attorney, but was unable to reach him.

---

1. In addition, both plaintiffs are members of Local 705, a required condition of their employment. Their membership in Local 705 has not been affected by the termination of their employment at the Union.

2. There were separate kitchens for male and female employees: the "men's kitchen" and the "girl's kitchen."

She returned to Kwiecien, who demanded an immediate answer. Korzen stated that she was still unwilling to participate in kitchen duty, as she did not use the kitchen. Kwiecien informed Valerio that Korzen had again refused. Later that day, Korzen reached her attorney and, after consulting with him, changed her mind regarding kitchen duty. She informed Kwiecien that she would perform kitchen duty, and asked that her name be put on a list to see Valerio. However, before Korzen was able to see Valerio, he terminated her for "insubordination." At no time was Korzen informed that her refusal to participate in kitchen duty would result in her termination.

### B. Marsha O'Brien

O'Brien was first hired by Local 705 in April, 1973, and she worked there as a clerk off and on for the next ten years. In September, 1986, she was hired as primary secretary to Secretary–Treasurer Ligurotis. On February 16, 1993, four days after Ligurotis was removed from office, O'Brien arrived at work, and was informed by Local 705 President Donald Heim that the Union's lawyer had stated that O'Brien could not be in the office and would have to leave. O'Brien then sought out Ligurotis, who confirmed that he had been removed as Secretary–Treasurer. O'Brien left the building and had no further contact with Local 705 until approximately one or two weeks later, when she called Valerio to inquire about the status of her employment. He informed her that she had been replaced by another employee, and that she should "leave it as is."[3]

On March 22, 1993, O'Brien filed a grievance with the Local 705 Executive Board, stating that she never received notice of dismissal or severance pay, and seeking reinstatement plus backpay. This grievance was denied as meritless. In addition, she filed,

---

**3.** Local 705 admits for the purpose of this motion that it actually terminated O'Brien's employment.

**4.** Local 705 does not contest that this language generally provides the basis for a suit brought by a member against a labor organization for a violation of its constitution or bylaws. *See Woodell v. Intern. Broth. of Elec. Workers,* —— U.S. ——, —————, 112 S.Ct. 494, 499–500, 116

on March 24, 1993, a charge with the Equal Employment Opportunity Commission, challenging the Union's decision to terminate her without notice or severance pay.

### II. Summary Judgment Standard

■ Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

### III. Discussion

Counts I through IV are grounded in the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.* Section 301 of that Act provides:

(a) Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States.... [4]

---

L.Ed.2d 419 (1991). We feel compelled to note, however, that in acknowledging that § 301 applies to such suits, Local 705 dramatically misstates the holding of the Supreme Court case it cites. According to Local 705, "[i]n *Plumbers and Pipefitters v. Plumbers and Pipefitters, Local 334,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), the Court held that a member may sue a labor organization under LMRA § 301 for violation of its constitution or bylaws." Defen-

Plaintiffs' complaint allege violations of both the union's International Constitution and Local 705's constitution and bylaws. Each claim shall be considered in turn.

## A. International Constitution

■ In Counts I and III, plaintiffs maintain that Local 705 violated § 301 by breaching Article XIX, Section 7(b)(10) of the International Brotherhood of Teamsters Constitution, which provides:

> (b). The basis for charges against members, officers, elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial shall consist of, but not be limited to, the following:
>
> . . . .
>
> (10). Retaliating or threatening to retaliate against any member for exercising rights under this Constitution or applicable law, including the right to speak, vote, seek election to office, support the candidate of one's choice, or participate in the affairs of the Union.

Plaintiffs argue that, in terminating their employment, Local 705 was "retaliating" against them because of their connection to the ousted Secretary–Treasurer Daniel Ligurotis, in violation of the above provision of the International Constitution.[5] We disagree. It is apparent that Section 7(b)(10) only protects individuals in their *membership* capacity, rather than governing the relationship between a union and its *employees,* even if those employees are also members.[6] In *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Supreme Court considered a provision of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.,* which closely mirrors Section 7(b)(10). Specifically, Sec-

tion 609 of that Act provides, in relevant part:

> It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act.

Section 609, 29 U.S.C. § 529.[7] The plaintiffs in *Finnegan* were employees and members of Local 20 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Following a hotly contested election for the presidency of Local 20 in which the incumbent was defeated, the new president discharged the plaintiffs, all of whom had openly supported his opponent. However, their membership rights remained unaffected.

Plaintiffs brought suit, claiming a violation of Section 609 of the Act, but lost both in the district court and on appeal. The Supreme Court affirmed, concluding that Section 609 protected membership, not employment, interests:

> [W]e conclude that the term "discipline," as used in § 609, refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union. Section 609 speaks in terms of disciplining "members"; and the three disciplinary actions specifically enumerated—fine, suspension, and expulsion—are all punitive actions taken against union members as members. In contrast, discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees. We discern nothing in § 609, or its legislative history, to support petitioners' claim

dant's Memorandum of Law at 2 n. 2. In fact, the *Plumbers* Court explicitly stated that "[w]e also need not decide whether individual union members may bring suit on a union constitution against a labor organization." *Plumbers,* 452 U.S. at 627 n. 16, 101 S.Ct. at 2553 n. 16. Although this error does not affect Local 705's position in the present motion, we encourage defendant to be more careful in its citations to "authority."

5. Korzen claims a violation based upon both her termination and her "demotion" to claims adjuster trainee.

6. As noted above, plaintiffs' membership rights in the Union have remained unaffected.

7. These rights included the right to attend membership meetings, vote, and express any views or opinions, including those regarding candidates for election. *See* 29 U.S.C. §§ 411(a)(1) & (2).

that Congress intended to establish a system of job security or tenure for appointed union employees.[8]

*Finnegan,* 456 U.S. at 437–38, 102 S.Ct. at 1871 (emphasis in original) (citation omitted) (footnote omitted). We find the present situation virtually indistinguishable. Plaintiffs are attempting to convert a provision clearly directed at protecting membership rights into an employment contract. Like the Court in *Finnegan,* we are simply unwilling to take that leap. Accordingly, Local 705 is entitled to summary judgment on Counts I and III.

## B. Local 705's Constitution and Bylaws

■ Defendant is also entitled to summary judgment on Counts II and IV. There plaintiffs assert that their respective terminations violated Local 705's local constitution and bylaws. Section 20(D)(2) of that document states:

> (2) Every member, by virtue of his membership in the Local Union, authorizes his Local Union to act as his exclusive bargaining representative with full and exclusive power to execute agreements with his employer governing terms and conditions of employment and to act for him and have final authority in presenting, processing, and adjusting any grievance, difficulty or dispute arising under any collective bargaining agreement or out of his employment with such employer.... The Local Union ... may decline to process any grievance, complaint, difficulty or dispute if in their reasonable judgment such grievance, complaint or dispute lacks merit.

Plaintiffs maintain that this language requires Local 705 to provide them fair representation in their grievance against it, and also protects them from dismissal without "just cause." These arguments, however, suffer from the same failing as that regarding the International Constitution. Section 20(D)(2) is clearly directed at those individuals for whom the Union is the bargaining representative, *i.e.,* members in their membership capacity. It is undisputed that no collective bargaining agreement exists regarding plaintiffs' employment, and that Local 705 does not provide bargaining services for its own employees. Because Section 20(D)(2) only concerns itself with employment for which the Union is the "exclusive bargaining representative," it is inapplicable here. *Cf. Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1966) (statutory duty of fair representation only owed to members of the collective bargaining unit for which the union is the exclusive bargaining representative).

This result is supported by the relevant caselaw. For example, in *Kunz v. United Food & Commercial Workers, Local 876,* 5 F.3d 1006 (6th Cir.1993), the plaintiff, an employee of the union, was required to join the union and sign a form with an exclusive bargaining agent designation, acknowledging union membership, as a prerequisite to her employment. She was subsequently terminated, and her efforts to challenge her dismissal internally were unavailing. She filed a lawsuit asserting, among other things, breach of the duty of fair representation and dismissal without just cause. *Kunz,* 5 F.3d at 1008 & 1010 n. 2. The district court granted summary judgment to the union, and plaintiff appealed. The Court of Appeals first considered her "fair representation"

---

**8.** The Court also considered Section 102 of the Act, which provided general authority for an action against a union for violations of the Act. The Court concluded that it was possible that a plaintiff who was unable to state a claim under Section 609 for the reasons given by the Court might nonetheless have a cause of action under Section 102. However, because the plaintiffs in *Finnegan* were in policymaking positions, the Court concluded that the new president was not precluded under Section 102 from terminating them and selecting his own staff. The Court also noted that the rule might not be the same if the employees discharged were "non-policymaking and nonconfidential." *Finnegan,* 456 U.S. at

441 n. 11, 102 S.Ct. at 1873 n. 11. This exception, however, only applied to consideration of Section 102; the Court did not consider the nature of the plaintiffs' employment in considering Section 609, since the Court determined that that Section only related to *membership* rights. *Id.* at 437–38, 102 S.Ct. at 1871–72. In the present case, plaintiffs are only asserting a claim based on a provision similar to Section 609; the nature of their employment is thus irrelevant. We note however, that plaintiffs apparently had access to confidential information, thus pulling them within the total ambit of *Finnegan. See e.g., Hodge v. Drivers, Etc. Local 695,* 707 F.2d 961, 965 (7th Cir.1983).

claim, which was grounded in the form she had signed, as well as oral statements made at the time of her job interview. In rejecting plaintiff's arguments, the Court stated that her claim

> contemplate[d] an adversarial relationship between the union and the employer that did not and could not have existed in the instant case. Local 876 had no duty to represent [plaintiff] against her employer because Local 876 itself was her employer. Moreover, even if plaintiff could have successfully proved a breach of the duty of fair representation, she could not identify any collective bargaining agreement that had been breached by her termination because no such agreement existed. *McTighe v. Mechanics Educational Soc., Local 19,* 772 F.2d 210 (6th Cir.1985) (Discharged supervisor cannot claim jurisdiction under § 301 where he was not part of a collective bargaining unit and was therefore not covered by any bargaining agreement).

*Kunz,* 5 F.3d at 1009. The court also affirmed summary judgment on plaintiff's "just cause" claim, noting that it was "without merit because plaintiff ... failed to identify any specific sections in the constitution or bylaws of the union that *explicitly* provide for just cause termination." *Id.* at 1010 n. 2 (emphasis added).

■ The same analysis applies with equal force here.[9] There is certainly no explicit just cause provision in any of the documents upon which Korzen relies.[10] Likewise, the language of Section 20(D)(2) clearly contemplates providing representation for a member's grievances only to the extent that the

union serves as the bargaining representative for the member. The alternative reading that plaintiffs urge would have the bizarre result that the union would be forced to process a grievance against itself. Like the court in *Kunz,* we can not imagine that the union contemplated such a situation in drafting its constitution and bylaws "because of the obvious legal conflicts that would arise from such an arrangement."[11] In sum, we are simply unwilling to read Local 705's constitution and bylaws as an employment contract, and therefore see no basis for plaintiffs' claims.[12] Accordingly, we grant Local 705's motion for summary judgment on Counts II and IV.

## C. Title VII—Retaliatory Discharge

■ We now turn to Korzen's Title VII claim. Korzen maintains that she was discharged in retaliation for filing a charge with the EEOC. In order to establish a prima facie case of retaliatory discharge under Title VII, Korzen must demonstrate that:

> (1) she engaged in a statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action.

*Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir.1989) (citations omitted). Local 705 challenges Korzen's Title VII claim on the ground that there is no causal link between the filing of the EEOC charge and her termination. Specifically, they note that even after Local 705 remedied the challenged practice by requiring men to perform kitchen duty, Korzen demonstrated

---

**9.** Korzen attempts to distinguish *Kunz* by pointing out that the basis for Kunz's claim was not the constitution or bylaws of the local union, but merely the form she had signed. This distinction, however, does not alter the relevant analysis: absent clear intent to the contrary, courts are unwilling to read provisions designed at protecting union members in their membership capacity to provide a cause of action for union employee-members in their employment capacity.

**10.** Plaintiffs acknowledge that their just cause claim "require[s] some implication." However, they provide no authority for legitimately drawing such an inference.

**11.** Even plaintiffs acknowledge that "the union would be hard-pressed to process a formal grievance against itself," but nonetheless ask us to read the documents to reach that end.

**12.** On the contrary, Local 705's constitution and bylaws expressly provide that the Secretary–Treasurer has

> charge and supervision of all the officers and employees of the Local Union.... He shall have the power to appoint, suspend, or discharge all appointive organizers, appointive Business Agents, Assistant Business Agents, and employees....

insubordination in refusing to comply. While this is true, we can not state as a matter of law that there exists no causal link between her EEOC challenge and her termination, and therefore deny defendant's motion for summary judgment.

It is well established that the timing of events leading up to the adverse action may be sufficient to establish the necessary causal link. *See Holland*, 883 F.2d at 1315. Korzen filed her EEOC charge on March 24, 1993. She was placed on kitchen duty for the week of May, 3, 1993, when she was on vacation, and again for the week of May 10, 1993. After Korzen refused to perform duty that week, Secretary–Treasurer Valerio instructed Kwiecien to put Korzen on the duty list for the following week. That Friday, Valerio instituted kitchen duty for men, and instructed Kwiecien to inform Korzen of that fact and ask whether she would perform kitchen duty the following week, as scheduled. After an unsuccessful attempt to consult with her lawyer about the legal ramifications of Valerio's actions, Korzen refused. However, she subsequently spoke with her attorney, and changed her mind. She informed Kwiecien of her decision, and asked to see Valerio to similarly inform him. Before she was able to speak with him, however, he terminated her.[13]

■ This series of events supports the possibility that Korzen was fired for challenging a long-standing discriminatory practice. Indeed, this case closely resembles *Mack v. County of Cook*, 827 F.Supp. 1381 (N.D.Ill.1993). There, a black employee filed a charge with the EEOC charging her employer, Cook County, with racial discrimination. Six weeks later she was fired for insubordination. In finding that the plaintiff had established a prima facie case of retaliatory discharge, the court concluded:

Thus, drawing all inferences in favor of [the plaintiff], her allegation that she was requested, within six weeks of filing her EEOC complaint, to perform a job of known repugnance to her and for which refusal to perform would lead to her termi-

nation, is sufficient to establish the causal link. . . .

*Id.* at 1387. Here, the action came approximately seven weeks after Korzen filed her EEOC complaint. She was informed of the change in Local 705's kitchen duty policy, and required to give an immediate answer as to whether she would participate in kitchen duty, despite her stated objection to the practice. She was not given time to consult with her lawyer, nor was she expressly informed that her refusal would result in termination. And although she changed her mind after consulting with her lawyer, the decision to terminate her was made so quickly that she was unable to recant her earlier refusal. This " 'telling' temporal sequence demonstrates a causal link" sufficient to preclude summary judgment on Count V. *Holland*, 883 F.2d at 1315. Accordingly, defendant's motion with respect to Count V is denied.

### D. Equal Pay Act

■ Both Korzen and O'Brien bring a claim under the Equal Pay Act, which provides in relevant part:

No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . .

29 U.S.C. § 206(d)(1). Therefore, to state a prima facie case under the Equal Pay Act, a plaintiff must demonstrate that (1) the employer paid different wages to employees of opposite sexes; (2) for equal work requiring equal skill, effort and responsibility; and (3) the employees worked under similar working conditions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Here, plaintiffs allege that male employees who were discharged received severance pay and additional time on the payroll to find new work, while plain-

---

**13.** We note that there is no indication that Korzen was ever informed that her failure to perform kitchen duty would result in her termi-

nation, although she apparently thought that it was a possibility.

tiffs received neither of these benefits. However, because they can not identify any male employees who performed work equal to theirs who also received these benefits, their Equal Pay Act claims must fail.

The Seventh Circuit has stated that "[t]he crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Fallon v. Ill.,* 882 F.2d 1206, 1209 (7th Cir. 1989) (quotations omitted). Indeed, the Seventh Circuit has narrowly construed the concept of "equal work." *See, e.g., EEOC v. Madison Community Unit School Dist. No. 12,* 818 F.2d 577, 584 (7th Cir.1987) (coaching high school basketball not "equal" to coaching high school soccer; coaching boys' track not "equal" to coaching girls' basketball); *see also Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (5th Cir. 1972) (must be "substantial identity of job functions"). According to plaintiffs, the relevant comparison for Equal Pay Act purposes is between their positions and those of "cage" employees. We must therefore compare the tasks performed by Korzen and O'Brien with those of cage employees to determine whether the standard plaintiffs have set is appropriate.

The primary duty of the cage employees is to act as liaison between members and business agents and representatives. They take messages from members and leave them for the appropriate representative or agent, or attempt to raise the representative or agent on the radio; in addition, they dispatch cars on certain duties. They also act as cashiers, receiving dues and issuing cash register receipts. In addition, they verify membership information on the computer. Finally, they run necessary errands using a company car, including picking up people at the airport and going to the post office. Korzen, on the other hand, was employed as a claims adjuster trainee. She reviewed files to determine which claims were to be paid, and then paid them on the computer. O'Brien, who worked as the Secretary–Treasurer's primary secre-

tary, answered his phones, sorted his mail, prepared executive board meeting minutes, organized his desk and maintained his appointment book. In short, with the possible exception of answering phones and taking messages, there is virtually no overlap between the plaintiffs' responsibilities and those of cage employees. We therefore conclude that no reasonable jury could find that "a significant portion of the ... jobs is identical." *Fallon,* 882 F.2d at 1209. Local 705 is therefore entitled to summary judgment on Counts VII and VIII.[14]

### E. Title VII Wage Discrimination

O'Brien also maintains that Local 705 violated Title VII, asserting the same facts that underlie her Equal Pay Act claim. However, to prevail on a Title VII wage discrimination claim, a plaintiff must either proffer direct evidence of intentional sex discrimination in pay (which O'Brien has failed to do), or meet the equal pay standard of the Equal Pay Act, as discussed above. *See EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 342–43 (7th Cir.1988). Because we have determined that there is no basis for plaintiffs' Equal Pay Act claims, there is likewise no basis for O'Brien's Title VII wage discrimination claim. Accordingly, we grant Local 705's motion for summary judgment on this claim.

### IV. Conclusion

For the reasons set forth above, we grant defendant Local 705's motion for summary judgment with respect to Counts I through IV and Counts VI through VIII. We deny defendant's motion for summary judgment with respect to Count V. It is so ordered.

---

14. We also note that plaintiffs' sole response to defendant's motion for summary judgment on the Equal Pay Act claims is a two sentence statement setting forth cage employees as the relevant comparison. There is absolutely no analysis of the work of either plaintiff or the cage employees, leading us to observe that plaintiffs have virtually waived their Equal Pay Act claims.