Christopher **BREWER,**
et al., **Plaintiffs,**

v.

**GENERAL DRIVERS, WAREHOUSEMEN & HELPERS LOCAL UNION 89, et al., Defendants.**

**CIVIL ACTION NO. 3:00CV–622–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

Feb. 26, 2002.

cal Union 89 ("Local 89"), which is affiliated with the International Brotherhood of Teamsters. Plaintiffs also say that their union, Local 89 Business Agents and Office/Clerical Association (the "Association"), violated its duty of fair representation under the Labor Management Relations Act. Finally, Guernsey asserts a Kentucky Civil Rights Act sex discrimination claim against Local 89. Defendants have moved for summary judgment, and in considering the motion, the Court will view the facts in the light most favorable to the non-movants. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

This case raises interesting questions about the tension between the rights of union members to publicly advocate the election or defeat of union leadership candidates and the rights of the victors to choose whom they may appoint to confidential positions. After thorough consideration the Court finds that the collective bargaining agreement between Local 89 and the Association (the "Agreement"), Local 89's bylaws, the International Teamsters' constitution and Supreme Court precedent dictate a result in favor of Defendants.

Thomas E. Clay, Sean Ragland, Bolus & Ragland, Louisville, KY, for Plaintiffs.

Irwin H. Cutler, Jr., Segal, Stewart, Cutler, Lindsay, Janes & Berry, David A. Friedman, Fernandez, Friedman, Grossman & Kohn, Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiffs Christopher Brewer, Curtis Manion and Vicki Guernsey allege breach of contract and violation of the federal Labor Management Reporting and Disclosure Act by their employer, General Drivers, Warehousemen and Helpers Lo-

## I.

Brewer and Manion were Local 89 business agents, handling grievances and negotiating collective bargaining agreements between Local 89 and its members' employers. Brewer, on leave from United Parcel Service, was appointed by the president of Local 89 in March 1996. Manion, on leave from Keebler Company, was appointed in September 1999. Local 89 hired Guernsey as a secretary to the president in August 1999, and placed her in a bookkeeping and office management position early that fall.

In a December 1999 election, Fred Zuckerman defeated the incumbent, Robert Winstead, to become the new Local 89 president. On January 14, 2000, Local 89 terminated Plaintiffs' employment, as well as the employment of two other clerical employees. Brewer and Manion were fired without explanation. Guernsey was told, in person and in writing, that she was being terminated because of financial constraints. Plaintiffs believe they were terminated because of their overt support for the reelection of Robert Winstead as president of the Local. The date of Plaintiffs' termination coincides with the date Zuckerman and his slate of candidates took office. One of Zuckerman's running mates was Carolin Washburn, who acceded to the position of secretary-treasurer after running on a platform of eliminating the position of bookkeeper to save union funds and promising to perform the duties herself.

After termination, Plaintiffs took their grievances to Zuckerman, who promptly denied them. On March 6, 2000, Zuckerman invited Guernsey to his office and informed her that, because of numerous errors she had committed in performing her bookkeeping duties, she was being let go permanently. Zuckerman also accused Guernsey of having released confidential information to which she had become privy in the course of her employment, and offered to let her resign. Guernsey refused, and was fired.

Plaintiffs then consulted the Association in an attempt to pursue their grievances to arbitration. The Association declined, stating in writing to Brewer and Manion that, as probationary employees, they were terminable at will, without access to the Agreement's grievance procedures. Later, the Association informed Guernsey that it declined to arbitrate her grievance because her termination had been for just cause. After unsuccessfully seeking relief from the National Labor Relations Board, Plaintiffs filed this action.

II.

■ Brewer and Manion argue that Local 89 can terminate them only with just cause. To evaluate this argument, the Court must analyze the Agreement, under whose terms Plaintiffs operated, as well as the Teamsters' constitution and Local 89's bylaws.

Article III of the Agreement provides as follows:

### ARTICLE III: PROBATIONARY EMPLOYEES

#### Section 1.
Office/clerical employees shall be considered probationary employees for a period of thirty (30) calendar days following their date of hire. During such period, such employee may be terminated at any time without access to the grievance procedure provided under this Agreement.

#### Section 2.
All business agents shall be considered probationary employees from date of hire until the expiration of their leave of absence from their former employer.

#### Section 3.
Probationary periods for office/clerical and business agents may be extended upon the mutual agreement of the principal officer of the Employer and the Association.

Brewer and Manion concede that, because they were on leave of absence from other employers while serving as business agents, they were probationary employees under the Agreement's terms. The parties' key disagreement concerns the proper interpretation of Section 1—specifically, whether its provision permitting termination at will applies to all probationary employees or only to office/clerical proba-

tionary employees. Brewer and Manion argue the latter, citing Article IV of the Agreement:

### ARTICLE IV: SENIORITY

#### Section 1.

For the purposes of this Agreement, an employee's seniority date shall be his/her original date of employment with the Employer.

#### Section 2.

An employee shall lose all seniority rights for any of the following reasons:

(a) Voluntary resignation;

(b) Discharge for just cause;

(c) Layoff for a continuous period of five (5) years;

(d) Falsifying records, including giving a false reason for leave of absence.

From the "just cause" text above and the absence of a termination-at-will clause in Article III, Section 2, Plaintiffs infer that probationary business-agent employees may be terminated only for just cause. However, such a reading creates the somewhat illogical result of two classes of probationary employees, one terminable at will, the other not.

The Court simply disagrees with Plaintiffs reading of the Agreement. Sections 1 and 2 of Article III primarily establish the time period within which various categories of employees remain on probationary status. Further, as a grammatical matter, the noun phrase which appears most immediately before "[d]uring such period, such employee may be terminated at any time without access to the grievance procedure" is "probationary employees." The

most logical reading of the Agreement, then, is that all probationary employees—not merely office/clerical probationary employees—are terminable at will without access to the grievance procedure.

■ Interestingly, the Agreement contains no definition of "probationary employee." However, the term has a common usage.[1] "[W]here words having a definite legal meaning are knowingly used in a writing the parties will be presumed to have intended such words to have their proper legal meaning in the absence of any contrary intention appearing in the instrument." *Sparks Milling Co. v. Powell,* 283 Ky. 669, 673, 143 S.W.2d 75, 77 (1940). The Agreement contains no suggestion of a definition contrary to the commonly understood legal meaning of the words. No language in the Agreement suggests that the signatories intended to redefine probationary status as applied to business agents. The Court concludes that "probationary employees" means employees terminable at will. To find otherwise render nugatory the very concept of a probationary employee.

The bid to guarantee business agents termination only for just cause fails for another reason: to so interpret the Agreement would run afoul of the Teamsters' constitution, which is binding upon all members. *Vestal v. Hoffa,* 451 F.2d 706, 709 (6th Cir.1971). Article XXII, Section 8 of the Constitution of the International Brotherhood of Teamsters provides, in pertinent part:

---

1. In *State College Borough,* 110 Lab. Arb. 718 (1998) (Franckiewicz, Arb.), the arbitrator considered whether, under a contract which set forth a "probationary period" but did not define the term, employees whose hire date fell within that period were terminable only for just cause:

> The almost universal understanding of a probationary period in labor relations is a

> period in which management has complete discretion to discharge the new employee, the usual just cause restriction being inapplicable during the probationary period.... Indeed, any other interpretation would render meaningless the phrase "probationary period" ...

*Id.* at 722.

The Business Agents and Assistant Business Agents of a Local Union may be appointed in the manner provided in the Local Union Bylaws. Appointed Business Agents or appointed Assistant Business Agents may be removed at will only by the appointing authority.

Local 89's bylaws, at Article V, Section (b)(6), explicitly entrust its president the power to terminate business agents at will.

The Court concludes that sensibly reading all the terms of the governing documents, Brewer and Manion were probationary employees subject to termination at will without access to the Association's grievance procedure.

## III.

Guernsey claims that Local 89 discharged her without just cause in violation of the Agreement. She contends that Local 89 terminated her because her husband had publicly supported Winstead and because she had driven a car with a Winstead bumper sticker on it. She points to the date of her termination—the day of Zuckerman's assumption of office—as evidence that she was discharged out of revenge for having supported his opponent.

In its defense, Local 89 notes that it terminated two other clerical employees the same day it terminated Guernsey, neither of whom appear to have taken sides in the Winstead–Zuckerman contest. Further, Guernsey and these two employees were the three office employees with the least seniority, and thus the most eligible to be laid off. Local 89 also offers evidence that its financial status was somewhat precarious in January 2000, that Carolin Washburn had been elected on a platform of eliminating unnecessary staff, and that Washburn assumed Guernsey's job duties after her discharge. Finally, as evidence that it acted properly in firing Guernsey after laying her off, the Local offers proof of numerous errors Guernsey made in bookkeeping. Guernsey does not dispute that she made these errors, but chalks them up to the Local's failure to adequately train her. However, neither the Court nor a jury need resolve these factual disputes to decide this case.

Local 89's bylaws, in Article V, Section (d)(1), give its secretary-treasurer the power to terminate without cause:

> The Secretary and Treasurer shall employ all necessary persons to perform the duties of his office ... He shall have the right, and is authorized, to discharge, transfer or otherwise relieve from duty any and all employees under his direction.

Thus, Washburn, as secretary-treasurer, had the right to discharge Guernsey, who served under her direction.

Moreover, the Teamsters' constitution contains a provision which prevents a local executive board from binding a successive board:

> A Local Union Executive Board shall not have the power to bind the Local Union for personal services to be rendered to the Local Union or its Executive Board, such as, but not limited to, legal, accounting, consulting, public relations and editorial services, by contract, agreement or otherwise, beyond the expiration of the term of the Executive Board in office at the time such action is taken. This shall not prevent a Local Union Executive Board from entering into a bona fide collective bargaining agreement with another union covering Local Union employees.

Article XXII, Section 2(b). Under the plain language of this provision Winstead's executive board had no power to bind Zuckerman's executive board as to any contract with an employee for personal services, including accounting. Guernsey clearly falls into that category. Notwithstanding the board's authority to enter

into a collective bargaining agreement, it could not bind a subsequent board with its choices of persons to perform this type of personal service.

Federal labor law is not replete with cases which feature facts and issues which resemble those confronted here. The Court has found only one such case. *Dean v. General Teamsters Union, Local 406*, 1989 WL 223013 (W.D.Mich.1989). In *Dean*, the local union's secretary-treasurer had verbally promised Dean an appointment as business agent for a three-year term, but Dean was terminated in a house-cleaning action eleven months after his appointment when his union went into trusteeship. Dean sued the union for breach of contract. The court found for two reasons that Dean stated no cause of action. First, the union's bylaws gave the secretary-treasurer authority to terminate any of its employees at will, and the court held that the bylaws superseded any employment contract between a union official and an appointed employee. Second, the bylaws disallowed the union's executive board, collectively and individually, from binding the union to a contract for personal services beyond the executive board's term of office.

*Dean* is certainly not binding authority. Moreover, *Dean* dealt with a business agent, not a bookkeeper. Nevertheless, the Court finds its logic convincing and consistent with its own analysis, particularly with regard to consideration of Local 89's bylaws and the Teamsters' constitution. In short, Washburn had authority to terminate Guernsey with or without cause. Consequently, Guernsey has no grounds to assert a breach of contract claim.

## IV.

█ Plaintiffs claim that their discharge violates the Labor Management Reporting and Disclosure Act (LMRDA). *See* 29 U.S.C. §§ 411(a)(1), 411(a)(2), 412 and 529. Its provisions protect union members' rights to vote, speak, and otherwise express themselves freely in the conduct of union activities without fear of reprisal. More specifically, they make it unlawful for a labor organization or representative thereof to "fine, suspend, expel, or otherwise discipline any of its members" for exercising any of these rights. 29 U.S.C. § 529. Plaintiffs argue that Local 89 infringed upon these rights by discharging them in retaliation for having supported Winstead in his reelection campaign.

In *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Supreme Court of the United States noted that § 411(a)(1)-(2) expressly protects "[e]very *member* of a labor organization," and that § 529 forbids union punishment of "any of its *members*" for exercising their LMRDA rights. 456 U.S. at 436, 102 S.Ct. 1867 (emphasis original). Consequently, the Court held that the term "discipline" in § 529 refers to "retaliatory actions that affect a union member's rights or status *as a member* of the union.... In contrast, discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees." *Id.* at 437–38, 102 S.Ct. 1867. Indeed, the Court observed, to hold otherwise would be to "claim that Congress intended to establish a system of job security or tenure for appointed union employees." *Id.* at 438, 102 S.Ct. 1867. Therefore, even if Plaintiffs were terminated for having backed a certain candidate, under *Finnegan* they state no claim under §§ 411(a)(1)-(2) or 529.

The *Finnegan* Court stopped short of holding that retaliatory discharge of a union member from union office could never violate 29 U.S.C. § 412. First, while dismissing the petitioners' § 412 claims, the Court left open the question whether "a

different result might obtain in a case involving nonpolicymaking and nonconfidential employees." 456 U.S. at 441, n. 11, 102 S.Ct. 1867.[2] Second, the Supreme Court noted that a plaintiff might state a claim under § 412 if he could show that his "dismissal from union office [was] part of a purposeful and deliberate attempt ... to suppress dissent within the union." *Id.* at 441, 102 S.Ct. 1867 (quotation, citation omitted).[3]

Even in these uncharted legal waters, however, Plaintiffs' claims would fail. Plaintiffs do not fall under any nonpolicymaking/nonconfidential exception left open in *Finnegan*. As Brewer testified in deposition, business agents' responsibilities include handling grievances and negotiating collective bargaining agreements, which fall within the realm of policymaking and confidential duties. Indeed, the plaintiffs in *Finnegan* were Teamsters business agents. *See also Cehaich v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 710 F.2d 234, 239 (6th Cir.1983) (finding that benefits representative did not fall within *Finnegan* exception because "[o]ne of the most sensitive functions performed by a union is the securing of benefits"). Guernsey, in her capacity as a bookkeeper, routinely worked with access to confidential information, also bringing her within *Finnegan*'s purview. *See Hodge v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees & Helpers' Local Union 695*, 707 F.2d 961, 964–65 (7th Cir.1983) (local union head secretary necessarily had access to confidential information and thus did not fall within *Finnegan* exception).

Plaintiffs claim that their termination evinces "part of a purposeful and deliberate attempt ... to suppress dissent within the union." 456 U.S. at 441, 102 S.Ct. 1867. In *Harvey v. Hollenback*, 113 F.3d 639 (6th Cir.1997), the Sixth Circuit Court of Appeals stated that "plaintiffs face an uphill battle in proving such a scheme," and that mere "innuendo" does not suffice to meet a plaintiff's burden of proof at trial. *Id.* at 644 (quotation, citation omitted). To provide context for their termination, Plaintiffs make inflammatory accusations against Zuckerman and his supporters, alleging brute violence against a Winstead supporter and an assassination plot against Winstead. The only support for these allegations is the deposition testimony of Robert Winstead, who refused to offer any details or evidence to support his opinions. Consequently, Winstead's testimony is mere innuendo, and not evidence upon which this Court or a jury could rely.

In the final analysis, the case here is a lot like *Finnegan*, in which the Supreme Court said,

"The Union's bylaws, adopted, and subject to amendment, by a vote of the

---

**2.** The Supreme Court has not revisited the question it left open in *Finnegan*'s eleventh footnote. However, the Court of Appeals for the Second Circuit has opined that this exception is illusory, because otherwise § 412 "would be transformed into a genie offering lifetime job security because Title I rights would be backed by a right to bring an action for any loss of union employment." *Franza v. Teamsters Local 671*, 869 F.2d 41, 47 (2d Cir.1989). Under *Franza*, "the test is not whether the employee is or is not in a policymaking position, rather the question is whether membership rights in the union were directly infringed by action taken with respect to a union member's employment status." *Id.* at 48. *See also Lennon v. Walsh*, 798 F.Supp. 845, 849–50 (D.Mass.1992) (embracing this holding); *Nixon v. United Food & Commercial Workers Int'l Union, Local 7*, 751 F.Supp. 1491, 1494 (D.Colo.1990) (same).

**3.** Without elaborating, the Supreme Court later remarked in *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 355 n. 7, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), that such a showing is not the only way to state a § 412 claim.

union membership, grant the president plenary authority to appoint, suspend, discharge, and direct the Union's business agents, who have significant responsibility for the day-to-day conduct of union affairs. Nothing in the [LMRDA] evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies."

*Id.* at 441–42, 102 S.Ct. 1867. Accordingly, the Court must dismiss Plaintiffs' LMRDA claims.

## V.

■ All three Plaintiffs claim that their union, the Association, breached its duty to fairly represent them, in violation of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Plaintiffs' action is a "hybrid suit," or one which "involve[s] allegations of a breach of the collective bargaining agreement by the employer and a breach of the duty of fair representation by the union, both in violation of section 301 ..." *Macon v. ITT Continental Baking Co.*, 779 F.2d 1166, 1168 (6th Cir.1985). To prevail on a hybrid § 301 claim, a plaintiff must prove both that his employer breached the collective bargaining agreement with the employee's union, and that the union breached its duty to fairly represent him before the employer. Liability cannot attach to either the employer or the union unless both prongs of this test are met. *Roeder v. American Postal Workers Union*, 180 F.3d 733, 737 (6th Cir.1999).

The Court has already found that the Teamsters' constitution and Local 89's bylaws function as part of the Agreement, and preempt those parts of the Agreement which conflict with them. *Cf. Gable v. Local Union 387, Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers*, 695 F.Supp. 1174, 1177 (N.D.Ga.1988) ("by-laws are analogous to specific contract terms or to an addendum adding terms to the original contract. Both the employer union and the employee member are bound by these terms.") Because, as a matter of law, Plaintiffs have failed to show that Local 89 breached the Agreement by terminating Plaintiffs' employment, Plaintiffs cannot meet their burden of proving a breach of the duty of fair representation.

## VI.

■ Finally, Guernsey alleges that Local 89 violated the Kentucky Civil Rights Act, K.R.S. § 344.010 *et seq.*, by discriminating against her in terms of employment on the basis of her sex. Specifically, Guernsey says that she was discharged so that Lisa Clifton, whom Guernsey alleges to be Zuckerman's paramour, could be hired in her stead.

■ Because the Kentucky Civil Rights Act was based upon, and is virtually identical to, Title VII of the federal Civil Rights Act of 1964, courts in Kentucky have followed federal law in interpreting and applying its statute. *Mills v. Gibson Greetings, Inc.*, 872 F.Supp. 366, 371 (E.D.Ky. 1994). For a plaintiff, then, to state a prima facie case of sex discrimination under the Kentucky Civil Rights Act, she "must establish, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) she was discharged; (3) she was qualified for the position which she held; and (4) she was replaced by a person outside the protected class or, in the alternative, that a comparable person outside of the protected class was treated more favorably than the plaintiff." *Id.* at 369. Guernsey does not allege that she was replaced by a person outside her protected class. Rather, she alleges that Local 89 violated the anti-discrimination act by terminating her in favor of another woman, with whom Zuckerman was having an affair.

Various United States Courts of Appeals have considered and rejected the notion that preferential treatment based on a consensual sexual relationship constitutes Title VII discrimination. *See, e. g., Womack v. Runyon,* 147 F.3d 1298, 1299–1300 (11th Cir.1998); *Taken v. Oklahoma Corp. Comm'n,* 125 F.3d 1366, 1369–70 (10th Cir. 1997); *Becerra v. Dalton,* 94 F.3d 145, 149–50 (4th Cir.1996), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997); *Hennessy v. Penril Datacomm Networks,* 69 F.3d 1344, 1353–54 (7th Cir. 1995); *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304, 306–08 (2d Cir. 1986), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987). As intriguing as this question is, the Court need not reach it. It is clear from the evidence that Local 89 did not replace Guernsey with Clifton; rather, Local 89 hired Clifton to replace Triesta Wafzig, who had succeeded Guernsey as secretary to the president upon Guernsey's hiring as bookkeeper in the autumn of 1999. Indeed, Guernsey was not replaced at all for several months, and her bookkeeping duties were assumed by Carolin Washburn, Local 89's secretary/treasurer. Guernsey fails to state a prima facie claim of sex discrimination.

The Court will enter an Order consistent with this Memorandum Opinion.

## ORDER

Defendants have moved for summary judgment on all of Plaintiffs' claims. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is SUSTAINED, and Plaintiffs' claims are DISMISSED WITH PREJUDICE.

This is a final and appealable order.